In the Matter of the Awarding of Letters of Administration in the Estate of ELRIC W. MONTY, Deceased.

EDNA A. BAXTER, Objectant, Appellant; EDWARD BRUNELL and ALEXANDER BRUNELL, as Administrators, etc., of ELRIC W. MONTY, Deceased, Petitioners, Respondents.

Third Department, April 29, 1942.

*Harold F. Tucker,* for the appellant.

*Feinberg & Jerry [Harold A. Jerry* and *Clyde A. Lewis* of counsel], for the respondents.

CRAPSER, J. The facts can be best gleaned from the decision of the surrogate, as follows:

"Decedent died intestate a resident of the town of Chazy, on May 27, 1941, at the age of seventy-nine. The petitioners are two of thirty-five first cousins of decedent. The petition shows the estimated value of decedent's personal property does not exceed $5,000 and that of his real estate $15,000. Edna A. Baxter appeared and objected to the appointment of petitioners as administrators, alleging that she was a half sister of decedent and his nearest next of kin. It is apparent that if she is decedent's lawful half sister, she is the sole distributee of his estate and is entitled to appointment as administratrix of his estate. * * * The sole question for determination is whether she is the legitimate daughter

of Moses Monty, decedent's father. If she is illegitimate, she is not entitled to letters of administration nor to any portion of decedent's estate. * * *

" Documentary evidence indicates that Moses Monty and Sophia Brunell were married on September 1, 1860. Two children were born of this marriage, a daughter, Etta, who was born on September 2, 1860, and died in 1874, and Elric, the decedent. Edna Baxter was born in 1852 at the home of Joseph Monty, father of Moses Monty, in the town of Chazy. This home was known as the Monty homestead. Moses, Wellington and Lafayette Monty [sons of Joseph Monty] all lived at the Monty homestead at the time Edna Baxter was born. None of them was ever married except Moses. Her mother's maiden name was Achsah Morey. Achsah Morey's mother was married three times to men named Morey, Kingsbury and Boucher. * * *

" Three witnesses testified on behalf of petitioners, viz.:

" Addie Lavigne, age sixty-seven, is a second cousin of decedent. Her grandmother, a sister of Moses Monty and the decedent, told her that Edna Baxter was the child of Moses Monty and Achsah Morey; that she was born out of wedlock at the home of Joseph Monty. By stipulation of counsel her deposition was later taken and, except for parts thereof eliminated by consent of counsel, was admitted as part of the evidence. In this deposition counsel for the petitioners calls her attention to the testimony previously given by her with respect to the father of Edna Baxter. He then asked her present recollection of the conversation with her grandmother regarding Edna Baxter and the witness replied, ' Of course she told me that Mose Monty was Edna's father but that there was always a doubt in the family as to whether it was Mose or Fay,' referring to Moses Monty and Lafayette Monty. She further testified, ' She believed it was Mose but they said she belonged to Fay as much as Mose, that is the way she worded it.'

" Dr. William F. Jones, age seventy-eight, is a first cousin of decedent and an interested party herein. His mother and Moses Monty were brother and sister. He testified to a conversation which he said occurred in 1879 or 1880 at the Monty homestead and in the presence of his mother, Wellington, Moses and Lafayette Monty and himself, in which his mother and Wellington Monty asked Lafayette Monty during his illness what disposition he was going to make of his property; Lafayette replied that there were two he was going to protect; his illegitimate daughter, Edna Baxter, and his nephew, Elric Monty. He also said that Wellington Monty told him that Edna Baxter was Lafayette Monty's illegitimate child. He further testified that he never heard any one in

the Monty family say that Edna Baxter was the child of Moses Monty. Petitioners offered the will of Lafayette Monty on file in the surrogate's office for the purpose of showing that a bequest of $200 was given to Edna Baxter.

" Silas Doty, age eighty-four, is not related to any parties in this proceeding. He testified that when he was nine or ten years of age he went to school with Edna Baxter in the town of Chazy and that she was then known as Edna Monty but the school children sometimes called her Edna Boucher.

" Edna Baxter testified that her grandmother, Mary Monty, wife of Joseph Monty, told her that Moses was her father and Achsah Morey her mother; that she was born in the Joseph Monty homestead; that her mother's parents lived only a short distance from the Monty homestead on the same road; that her maternal grandfather by a third marriage to her grandmother was John Boucher. She further testified of her own knowledge that Moses, Wellington and Lafayette Monty all lived at the Joseph Monty homestead; that her mother, Achsah Morey, continued to live there until she was six or seven years old; that she remembered her mother; that she continued to live at the Monty homestead for some years after her mother left there. She described in detail where the various members of the Monty family slept and particularly that her father and mother occupied the same bedroom. She testified to the occurrence when her father brought to the Monty homestead Sophia Brunell; that after her father and Sophia Brunell left the Monty homestead, she continued to live there with her grandmother, Mary Monty; that her mother's family and the Monty family were very friendly and visited each other very often; that she was always called Edna Monty before her marriage and never by any other name; that she always addressed decedent as ' brother;' that upon her marriage to Norman Baxter in 1870 she moved to Rhode Island and lived with her mother who had then married one Nathaniel Jillson. It should be observed that her testimony with respect to many of these matters refers to her recollections thereof as a child of tender years. She testified that Lafayette Monty always referred to her as ' niece.' That the decedent in his correspondence with her called her ' Dear sister Edna.' On cross-examination she testified that her mother, Achsah Morey, died about thirty-five years ago and was buried in Rhode Island; that she did not know the time or place of the marriage of her mother to Nathaniel Jillson. Petitioners offered as Exhibit 2 a letter addressed to this court from Edna Baxter, dated October 11, 1940, in which she made inquiry with respect to the estate of Lafayette Monty. In this letter she stated that

she was a niece of Lafayette Monty; she further said ' Elric Monty is my half brother and he claims I am not his sister but my father was his father. I called a few years ago and he fairly insulted me.' This letter was offered in evidence as an admission by the witness that Elric Monty had denied his relationship to her as stated in the letter.

" Maude Willette, age fifty-five, is a grandniece of Moses Monty and a second cousin of Edna Baxter. Her grandmother was a sister of Moses Monty. She testified that her grandmother told her that Moses Monty was the father and Achsah Morey the mother of Edna Baxter; that she also received the same information from her mother.

" John Pickel, eighty years of age, is not related to the Monty family but knew Moses, Lafayette, Wellington and Elric. He testified that he knew Edna Baxter for many years when she was a young girl prior to her marriage to Baxter; that at that time she was known as Edna Monty.

" Fannie Lewis, a grandniece of Moses Monty, testified that her mother told her that Moses Monty was the father and Achsah Morey the mother of Edna Baxter; she testified to a conversation sometime after Sophia Brunell Monty's death at which her mother, Arvilla Savage, and Moses Monty were present; that Moses Monty told her mother he was turning everything over to Elric Monty; that her mother asked him why he was doing this and he replied ' so Edna can't get it;' that her mother said ' Edna is just as near to you as Elric is.' Upon cross-examination she testified as follows: ' Q. Did you ever hear any question regarding the legitimacy of Edna Baxter? A. It was always counted she was illegitimate. Q. Did you say your mother told you that? A. Yes, it was from mama I got it.' By the Court: ' Q. Do I understand you to say that your mother told you Edna Baxter was the illegitimate daughter of Moses Monty? A. Yes, I never heard anything to the contrary. Q. Did your mother ever tell you that they held themselves out as man and wife? A. No, I never heard that.'

" Counsel for Edna Baxter offered in evidence Exhibits 3, 4 and 5, which her grandson, Raymond Baxter, testified were in her handwriting and were found by him in the Monty homestead shortly after decedent's death. Exhibit 3 was received in evidence without objection. It was written to Elric Monty in 1906 and the salutation is ' Dear brother.' Exhibits 4 and 5 were written in 1881 and 1905, respectively, and were addressed to Lafayette Monty. In each of these letters, the salutation was ' Dear uncle.' Counsel for petitioners objected to the admission of Exhibits 4 and 5 on the ground that they were irrelevant in that the issue

is as to the relationship of Edna Baxter to Moses Monty and not to Lafayette Monty. I believe this is correct and the objection to their admission is sustained.

"It will be observed that there is no proof of any ceremonial marriage of Moses Monty with Achsah Morey."

Moses Monty, of Chazy in the county of Clinton, was married to Sophia Brunell, of the same place, by H. G. Robbins, justice of the peace of the town of Champlain on September 1, 1860.

It was stipulated that the monument of Moses Monty, father of Elric Monty, bore an inscription showing that Etta Monty was born September 2, 1860, and died April 1, 1874.

The records of the First Methodist Church of Plattsburgh, N. Y., under date of October 26, 1870, show that Norman J. Baxter, of Beekmantown, N. Y., and Edna A. Monty, of Chazy, N. Y., were married by Rev. S. R. Bailey. Notice of this marriage was published in the local paper and undoubtedly came to the notice of Moses Monty and the Monty family who lived in that locality. This in itself is some evidence that Moses Monty recognized Edna Monty as his daughter. Further evidence is that after Sophia Brunell Monty's death Moses Monty told Arvilla Savage, who was his sister, that he was turning over everything to Elric Monty so that Edna could not get it, and that she replied, "Edna is just as near to you as Elric is." This evidence shows that Moses Monty understood that if he died intestate Elric and Edna would share equally in his property.

It is uncontradicted that Edna Baxter was born at the home of Joseph Monty, the father of Moses Monty, in the town of Chazy, and that her mother's name was Achsah Morey, who lived nearby the Monty homestead, and that her father, Moses Monty, and her mother, Achsah Morey, lived there as man and wife and cohabited together until she was about six years of age when her mother left to go to Rhode Island where it is said she married a second time. This creates a strong presumption of marriage and it is further strengthened by the evidence that Edna testifies she remembers when her father came home with Sophia Brunell, Sophia Brunell looked funny, she had never seen a woman in her condition. The record shows that Sophia Brunell and Moses Monty were married on September 1, 1860, and came to the Monty homestead and that Etta Monty was born the next day. This is proof direct that Joseph Monty and his wife would not permit them to come to their home until the marriage had been performed, and if that was true in the case of Sophia Brunell a strong inference is established that it was equally true in regard to the mother of Edna Baxter and that there must have been a marriage existing between Moses

Monty and Achsah Morey before they came to the home of Joseph Monty where Edna was born.

The surrogate has found on this evidence that Edna A. Baxter was not the lawful child of Moses Monty and is not entitled to have letters of administration issued on the decedent's estate to her. With this we cannot agree.

" The presumption of marriage, from a cohabitation, apparently matrimonial, is one of the strongest presumptions known to the law. This is especially true in a case involving legitimacy. The law presumes morality, and not immorality; marriage, and not concubinage; legitimacy and not bastardy. Where there is enough to create a foundation for the presumption of marriage, it can be repelled only by the most cogent and satisfactory evidence. In *Morris* v. *Davies* (5 Cl. & Fin. 163) Lord LYNDHURST, speaking of this presumption, says: ' The presumption of law is not lightly to be repelled. It is not to be broken in upon, or shaken by a mere balance of probability. The evidence for the purpose of repelling it must be strong, distinct, satisfactory and conclusive.' In *Piers* v. *Piers* (2 H. L. Cas. 331) Lord CAMPBELL said that the presumption could be negatived only ' by disproving every reasonable possibility,' and Lord BROUGHAM, in the same case, approved the general doctrine stated by Lord LYNDHURST in *Morris* v. *Davies*, and said that the presumption could be dispelled only by evidence which was ' clear, distinct and satisfactory.' The presumption has been acted upon in several cases in our own courts, and in some recent cases in England, which have a very direct bearing in support of the finding of the jury in this case. The earliest case in our courts is *Fenton* v. *Reed* (4 Johns. 52). In that case the question was whether the plaintiff was the widow of one Reed. In the year 1785, she was the lawful wife of John Guest. Sometime in that year Guest left the State for foreign parts, and continued absent until sometime in the year 1794 [1792], and it was reported and generally believed that he had died abroad. The plaintiff in 1792 married Reed. In that year, and subsequent to the marriage, Guest returned to this State, and continued to reside herein until June, 1800, when he died. He did not object to the connection between the plaintiff and Reed, and said he had no claim upon her, and never interfered to disturb their relations. After the death of Guest the plaintiff continued to cohabit with Reed until his death in 1806, and sustained a good reputation in society; but no solemnization of marriage was proved to have taken place between the plaintiff and Reed subsequent to the death of Guest. Upon these facts the court below decided in favor of the plaintiff. The court on appeal affirmed the judgment, saying ' there existed strong

circumstances from which a marriage subsequent to the death of Guest might be presumed. The parties cohabited together as husband and wife, and under the reputation and understanding that they were such from 1800 to 1806, when Reed died, and the wife during that time sustained a good character in society. A jury would have been warranted under the circumstances of the case, to have inferred an actual marriage, and the court below had sufficient ground to draw that conclusion; and as they have drawn it, and their decision being a substitute for a verdict, we will not disturb it.' It will be noticed that the parties to the marriage in *Fenton* v. *Reed* came together under a void contract of marriage, but supposing, as may be assumed, that the former husband was dead; but they continued their connection after the return of the first husband, and from that time until the death of Reed, their connection was known to be meretricious; but this fact was not considered sufficient to repel the presumption of a subsequent marriage. The same presumption was applied under circumstances very similar in *Rose* v. *Clark* (8 Paige, 574), and in *Caujolle* v. *Ferrié* (23 N. Y. 90) a marriage was presumed to sustain legitimacy, although it appeared that the connection of the parties commenced in an illicit intercourse." (*Hynes* v. *McDermott*, 91 N. Y. 451, at p. 459; *Caujolle* v. *Ferrié*, 23 id. 90; *Matter of Lentz*, 247 App. Div. 31.)

" Issue will not be bastardized as the outcome of a choice between nicely balanced probabilities. [*Head* v. *Head*, 1 Sim. & S. 150.] " (*Matter of Findlay*, 253 N. Y. 1, 8.)

" Improbability alone will not break the cogency of the presumption * * * nor will a result of illegitimacy be reached by a balancing of probabilities." (*Matter of Smith*, 136 Misc. 863.) " The presumption will not fail unless common sense and reason are outraged by a holding that it abides." (*Matter of Findlay*, 253 N. Y. 1; *Matter of Matthews*, 153 id. 443, 447; *Van Aernam* v. *Van Aernam*, 1 Barb. Ch. 375, 377; *Matter of Biersack*, 96 Misc. 161, 177; affd., 179 App. Div. 916.)

It is incumbent upon whoever assails the validity of a marriage and the legitimacy of children to prove his case by evidence instead of presumptions, even though that involves the proof of a negative. (*Matter of Meehan*, 150 App. Div. 681; *Matter of Byrnes*, 160 Misc. 474.)

In the absence of proof, the presumption is of marriage arising out of cohabitation in the apparent relation of husband and wife, of the innocent and lawful character of such relationship and of the legitimacy of children who are the fruit of such a union. (*Tracy* v. *Frey*, 95 App. Div. 579; *Matter of Biersack*, 96 Misc. 161; *Matter of Mancini*, 108 id. 102.)

The proofs of the present petitioners-respondents fall far short of the required standard and are utterly inadequate to sustain the decision of the surrogate to the effect that Edna A. Baxter is not the lawful child of Moses Monty and the finding to that effect by the surrogate should be disapproved and reversed and the decree of the Clinton County Surrogate's Court should be reversed.

HILL, P. J., HEFFERNAN and FOSTER, JJ., concur; SCHENCK, J., dissents.

Decree of the Clinton County Surrogate's Court reversed on the law and facts, with costs and disbursements in this court and in the Surrogate's Court to be paid out of the estate.

The decision and finding of the surrogate that the appellant, Edna A. Baxter, is not the lawful child of Moses Monty, father of the intestate, is reversed and this court finds that she is the lawful daughter of Moses Monty and entitled to letters of administration upon the estate of her half brother, the intestate.