**In re The MONETARY GROUP, the Securities Groups, the Securities Group 1980, and the Securities Group, Debtors.**

**Bankruptcy Nos. 84–428–BK–J–GP, 84–430–BK–J–GP, 84–431–BK–J–GP and 84–433–BK–J–GP.**

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

May 22, 1987.

See also 72 B.R. 378.

George E. Ridge, Jacksonville, Fla., for Louis Lowin.

Guy R. Fairstein, New York City, for Objectors.

Haywood M. Ball, Jacksonville, Fla., for The Equitable.

Cory E. Friedman, New York City, for The Equitable.

FINDINGS OF FACT AND CONCLU-SIONS OF LAW ON THE OBJEC-TION OF RANDALL W. ATKINS, CHARLES D. BARNETT, ORIN E. ATKINS, AND 500 PARK AVENUE ASSOCIATES TO THE AGREEMENT OF COMPROMISE AND SETTLE-MENT OF CLAIMS OF THE EQ-UITABLE LIFE ASSURANCE SOCI-ETY OF THE UNITED STATES

GEORGE L. PROCTOR, Bankruptcy Judge.

THIS MATTER came before the Court for hearing on the Objection of Randall W. Atkins, Charles D. Barnett, Orin E. Atkins, and 500 Park Avenue Associates (the "Objectors") to the Agreement of Compromise and Settlement (the "Settlement") entered into between Louis Lowin, as Chapter 11 Trustee, now Post-Confirmation Administrator (the "Trustee") of The Securities Groups, the Monetary Group, The Securities Group 1980, and The Securities Group ("the estates"), and the Equitable Life Assurance Society of the United States ("The Equitable"). The Settlement, which compromises and settles the claims of The Equitable filed in the above-captioned estates, is basically undisputed.

The Securities Groups ("Groups"), as tenant, entered into an Agreement of Lease dated as of January 1, 1980, with 500 Park Avenue Associates ("Associates"), an Objector herein,[1] for the entire tenth and eleventh floors of 500 Park Avenue, New York, New York. On or about April 1, 1981, Groups executed a First Amendment of Lease in which it agreed to lease the entire ninth floor of 500 Park Avenue as well. Subsequently, Associates and The Equitable agreed that The Equitable would purchase and demolish the adjoining Nassau Hotel and construct a mixed use tower on its site, which would be linked floor-for-floor with the existing eleven floors of 500 Park Avenue, thereby substantially increasing the square footage of each floor. On or about September 1, 1981, Groups executed the Second Amendment of Lease, whereby Groups agreed to accept the space to be constructed in the new tower adjoining the existing ninth, tenth and eleventh floors. The Agreement of Lease and the amendments thereto are referred to collectively herein as the "Lease".

On or about September 29, 1981, The Equitable purchased the building located at 500 Park Avenue and the Nassau Hotel and, in conjunction with that purchase, Associates assigned its rights as landlord under the Lease to The Equitable.

Thereafter, Groups failed to pay rent due and owing to The Equitable under the Lease. (Tr. at p. 86)[2] Accordingly, on or about March 13, 1984, The Equitable commenced a lawsuit[3] in the Civil Court in the City of New York, seeking a final judgment of eviction as well as an award of rent arrearages. The trial of that action

---

1. Randall W. Atkins and Orin E. Atkins, also Objectors herein, were General Partners of 500 Park Avenue Associates.

2. References to specific pages in the hearing transcript are indicated by the abbreviation Tr. at p. ——. References to the hearing exhibits are noted by the abbreviations Tr. Exh. ___ and Obj. Exh. ___.

3. *The Equitable Life Assurance Society of the United States v. The Securities Groups,* Index No. L & T 37140/84.

commenced on April 19, 1984. The filing of the Groups' petition for relief on May 24, 1984, stayed further proceedings before the Civil Court.

The Equitable then moved before this Court for relief from the stay in order to allow it to proceed to a judgment of eviction in the Civil Court. On August 8, 1984, this Court granted The Equitable's motion (Tr. at p. 89). The Equitable then returned to the Civil Court where Judge Charles E. Ramos entered a judgment of eviction awarding possession of the premises to The Equitable and rental arrearages in the amount of $1,623,040.63 against Groups.[4] (Tr. at p. 89; Tr. Exh. 2).

Subsequently, The Equitable filed proofs of claims in each of the estates in the amount of $16,332,176.18. (Tr. Exh. 8) Those claims reflected the amount due The Equitable for the period from Groups' initial failure to pay rent through the unexpired term of the Lease and include the judgment awarded by the Civil Court. Also included in that amount was an administrative claim of $890,985.20 for post-petition rent which had not been paid.

This Court held a hearing on June 17, 1986, to consider objections filed by the Trustee to Equitable's claims. Notice of the hearing was given to all interested parties. None of the Objectors raised any objection to The Equitable's claims at that time. At that hearing, the Trustee and The Equitable announced the terms of the Settlement, whereby The Equitable reduced its claims in each of the estates to $3,529,-114.39 and acknowledged that the payment of that sum would constitute full payment of all of its claims. (Obj. Exh. 1).

### THE OBJECTIONS

Although none of the Objectors, including Associates, the original landlord under the Lease, filed objection to The Equitable's claims, they have filed Objections to the Settlement. The Objectors raise four objections:

1) Insufficiency of notice;

2) Excessive amount;

3) Multiple claims; and

4) Judicial estoppel.

For the reasons set forth below, the Court has concluded that the Objections should be denied.

### DISCUSSION OF THE OBJECTIONS

At the hearing on February 12, 1987, the Court heard the testimony of the Trustee and Robert H. Speer, The Equitable's Director of Leasing for the New York region. (Tr. at p. 71). Both were called to testify by the Objectors. The Objectors offered no other witnesses.[5] The Trustee credibly testified regarding the factors which led him to conclude, based upon his evaluation of the investigation and analysis of his counsel, that the Settlement was fair, reasonable and adequate and in the best interest of the estates. (Tr. at pp. 56, 58–59) The Trustee's conclusion was based upon four factors:

1) The Equitable had obtained, after a hotly contested trial, a judgment against the Groups in the Civil Court;

2) The Equitable had sustained substantial damages, which it had diligently attempted to mitigate;

3) Litigation to further reduce The Equitable's claims was likely to be extremely costly and was unlikely to succeed; and

4) The Equitable had agreed that not only would it reduce its unsecured claim but, in addition, it would waive its administrative claim for post-petition rent in the amount of $890,985.20, which, if paid on confirmation as provided by the Bankruptcy Code, would have made confirmation of a plan impossible.

---

**4.** Judge Ramos wrote a detailed and thoughtful opinion in which he explained the basis of the judgment he granted.

**5.** The Trustee has moved to dismiss the Objections. Because the Court has concluded, based upon the evidence at trial, that the Objections should be denied, the Trustee's motion has been superseded.

Mr. Speer credibly testified with regard to the basis of The Equitable's claim and the extensive efforts made by The Equitable to mitigate its damages after Groups' default.[6] The Equitable's efforts to reclaim the space were frustrated by an arcane legal problem. Groups had sublet the most desirable 4,000 square feet (overlooking Park Avenue) of the 16,150 square foot tenth floor of 500 Park Avenue to Temporary Hanseatic, Inc. ("Temporary Hanseatic"). Temporary Hanseatic was also occupying a portion of the ninth floor. Because the tenth and eleventh floors were penetrated by an internal staircase, they were, for all practical purposes, a single unit.

In seeking to reclaim the three floors, The Equitable confronted a classic trap for the unwary New York lessor. Groups purported to tender possession of the ninth, tenth and eleventh floors, however, Temporary Hanseatic failed to join in that tender. (Tr. at pp. 91–93). In *Eten v. Luyster*, 60 N.Y. 252 (1875), the New York Court of Appeals held that, if a landlord accepts a tenant's tender of possession without the simultaneous tender by all subtenants, any non-tendering subtenant becomes, by operation of law, a direct tenant of the landlord. New York courts continue to follow the rule of *Eten v. Luyster*. *E.g., Da Costa's Automotive, Inc. v. Birchwood Plaza Shell, Inc.,* 106 A.D.2d 484, 482 N.Y.S.2d 832 (2d Dep't 1984); *Precision Dynamics Corp. v. Retailers Representatives, Inc.,* 120 Misc.2d 180, 181–82, 465 N.Y.S.2d 684 (N.Y.C.Civ.Ct.1983):

> The basic rule is that a sublease is dependent on and limited by the terms and conditions of the main lease from which it is carved. A subtenancy may thus be terminated by the expiration of the term of the lessee of a re-entry by the landlord for a condition broken. (*Eten v. Luyster*, 60 NY 252; *Hoffman Brewing Co. v. Wuttge*, 234 NY 469 [138 N.E. 411]; *Ashton Holding Co. v. Levitt*, 191 App Div 91 [180 N.Y.S. 700]; *New*

*York Rys. Corp. v. Savoy Assoc.*, 239 App Div 504 [268 N.Y.S. 181]; *Metropolitan Life Ins. Co. v. Hellinger*, 264 App Div 7 [284 N.Y.S. 432], affd 272 NY 24 [3 N.E.2d 621]; *World of Food v New York World's Fair 1964–1965 Corp.*, 22 AD2d 278 [254 N.Y.S.2d 658]; 1 Rasch, New York Landlord & Tenant—Summary Proceedings [2d ed], §§ 234, 246.)

Equally well settled is that when a sublessor voluntarily surrenders his main lease not pursuant to any provision of such lease and same is accepted by the landlord, the subtenant becomes the immediate tenant of the original lessor and the interest and terms of the subtenant continue as if no surrender had been made. (*Rhinelander Real Estate Co. v. Cammeyer*, 117 Misc 67 [190 N.Y.S. 516]; [App Term, 1st Dept]; *Eten v. Luyster*, 60 NY 252, *supra; Kottler v New York Bargain House*, 242 NY 28 [150 N.E. 591]; *Ashton Holding Co. v Levitt, supra; Oshinsky v Greenberg*, 39 Misc 342 [79 N.Y.S. 853] [App Term]; *Harwyn Dress Corp. v International Dress Co.*, 147 NYS2d 254.)

The effect of a voluntary surrender is equivalent to a transfer of the reversion, the interests of the landlord and tenant merge, and what remains is the landlord's fee subject to the subtenancy. Such subtenancy remains because the landlord and tenant may not affect the rights of third parties who are not parties to their separate surrender agreement. (*Ashton Holding Co. v. Levitt, supra; Eten v Luyster, supra.*) (Emphasis added.)

Thus, unless The Equitable could obtain the return of all three floors, it would be stuck with Temporary Hanseatic occupying the most desirable portion of the tenth floor plus part of the ninth floor for the balance of the ten-year lease, thereby rendering the remainder of the tenth floor, the remainder of the tenth-eleventh floor unit and, in all likelihood, the ninth floor unmar-

---

**6.** Because The Equitable did mitigate its damages, there is no need to determine whether New York requires a landlord to mitigate its damages after a tenant defaults on a commer-

cial lease. Suffice it to say that *Becar v. Flues*, 64 N.Y. 518 (1876), in which New York's Court of Appeals held that there is no duty to mitigate, has not been overruled by that Court.

ketable. To avoid this disastrous result, The Equitable followed the only prudent course, which was to proceed to evict Groups from all three floors, thereby terminating Temporary Hanseatic's subtenancy. *See Precision Dynamics Corp., v. Retailers Representatives, Inc., supra.*

The Objectors argue that The Equitable should have accepted Groups' purported tender of the ninth, tenth and eleventh floors on May 15, 1984, approximately six months before The Equitable was granted a judgment of eviction and entered the premises and should have attempted to re-let the space at that time. This argument ignores the fact that the failure of Temporary Hanseatic to join in the tender rendered Groups purported tender illusory.

That Temporary Hanseatic's counsel stated that it had no defense to eviction but merely wished to stay issuance of the warrant of eviction is a distinction without a difference. The fact is that Temporary Hanseatic was not agreeing to return the space and The Equitable was not required to wager that *Eten v. Luyster* would not apply to Temporary Hanseatic's artfully crafted position. To do so would have been commercially unreasonable and the Court cannot hold that The Equitable was required to take this potentially ruinous risk.[7]

Upon regaining the premises on October 29, 1984, The Equitable immediately set to reletting the premises. (Tr. at 93–94). Initially The Equitable was successful in renting the ninth floor to Quadraeconomics, Inc. In order to secure that tenant, The Equitable, consistent with prevailing market conditions, granted Quadraeconomics a four month rent abatement and a $250,000 work letter.[8] (Tr. at 94–95). The Equitable then agreed to lease the tenth floor to S.J. Warburg, English merchant bankers.[9]

After securing S.J. Warburg as a tenant, however, Walt Disney Enterprises ("Disney") expressed an interest in leasing both the 10th and 11th floors. By making special concessions to S.J. Warburg (which are not part of The Equitable's claim) The Equitable was able to induce S.J. Warburg to move to the seventh floor, thereby freeing the tenth-eleventh floor unit for lease to Disney, which commenced on May 1, 1985. Again, because of market conditions, plus the negotiating skill of Disney's real estate subsidiary, ARVIDA, The Equitable agreed to a $316,000 work letter and abated eight months rent. (Tr. at p. 96).

■ After qualification by the Court as an expert witness, Mr. Speer testified that, in his opinion, the Quadraeconomics and Disney leases were commercially reasonable. He also testified that these were the best long or short term opportunities available to The Equitable. (Tr. at pp. 95–96). The Court finds Mr. Speer's opinion to be credible and, in the absence of any contrary evidence, accepts it.[10] Therefore, the Court concludes that The Equitable acted reasonably under the circumstances to mitigate its damages and is entitled to its full claim as limited by 11 U.S.C. § 502(b)(6).[11]

---

**7.** In light of the Court's conclusion, it is not necessary to reach The Equitable's contention that the unsworn statements of Temporary Hanseatic's counsel in another proceeding, which were not subject to cross-examination, are inadmissible hearsay.

**8.** A work letter is an agreement by the landlord to pay for a specified amount of tenant improvements.

**9.** The proposed lease to S.J. Warburg contemplated that S.J. Warburg would initially lease 10,839 of the 16,150 square feet contained in the tenth floor and that it would, in the course of the lease, take the remaining portion of the tenth floor.

**10.** Objectors argue, *see* Obj. Exh. 14, that The Equitable should bear the burden of the rent

abatements and work letters which were required in order to re-let the premises after the Debtors' default. This is contrary to the evidence and is without basis in the Bankruptcy Code. Therefore, the Court need not reach The Equitable's objection to the admission of Obj. Exh. 14, which is intended to quantify the effect of this argument.

**11.** Objectors also argue that the period of rent allowed under 11 U.S.C. § 502(b)(6)(A)(ii) should commence on May 15, 1984, the date of the filing of the petitions. Because the Court has concluded that The Equitable's rejection of the purported surrender was reasonable, The Equitable's computation from May 24, 1984 is proper.

■ Having concluded that there is no basis for reducing The Equitable's claim as limited by U.S.C. § 502(b)(6), the Court is compelled to agree with the Trustee's conclusion that the settlement is in the best interest of the estates. In *In re Blair*, 538 F.2d 849, 851–52 (9th Cir.1976), which like this case, was a liquidation case, the Ninth Circuit set forth the standard for evaluation this settlement:

> When considering whether to approve a compromise in liquidation bankruptcy proceedings, the trustee and bankruptcy judge should weigh the probable costs and benefits. They should consider factors such as the complexity and hazards of litigation, the expense (attorney's fees and the costs of court and discovery), the time required, and whether disapproval of the compromise would likely result in the wasting of assets.
>
> \*    \*    \*    \*    \*    \*
>
> The bankruptcy judge and the district court may, in a case such as this, give weight to the opinions of the trustee, the parties, and their attorneys. The judge and court may consider the principals' belief that the factors outlined above (and others) have been explored and considered and that the compromise is fair, reasonable, and the wisest course. *Consideration should also be given to the principle that the law favors compromise and not litigation for its own sake.*
>
> \*    \*    \*    \*    \*    \*
>
> A liquidation bankruptcy is a terminal affair. The bankrupt's financial affairs are beyond repair. Liquidation is to be accomplished as rapidly as possible consistent with obtaining the best possible realization upon the available assets and without undue waste by needless or fruitless litigation. (Emphasis added.)

*See also, Protective Committee For Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968); *In re Jackson Brewing Co.*, 624 F.2d 599 (5th Cir.1980).

At the February 12, 1987, hearing on this matter, Objectors devoted their entire case in chief to an attempt to: 1) impeach the Trustee's investigation of the advisability of the settlement; and 2) impeach The Equitable's claim. No affirmative evidence of any realistic alternative was offered.

Despite full discovery in preparation for the trial, no viable basis for contesting The Equitable's claim has been presented to the Court. Thus even if, *arguendo,* the Trustee's investigation was deficient, which the Court finds is not the case, there is no reason to doubt his conclusion that any litigation of The Equitable's claim would be costly, time consuming and, in all likelihood, unsuccessful.

Moreover, in agreeing to forego the dubious benefits of litigation, the Trustee was able to obtain a waiver of The Equitable's administrative claim. Given the fact that The Equitable's administrative claim, which would have been payable at confirmation, exceeded the cash on hand at confirmation, that waiver made confirmation of the plan possible and clearly establishes that this Settlement is in the best interest of the estates.

The Objectors' remaining objections need no extensive discussion. Objectors claimed that "[t]he notice of the Settlement Agreement is insufficient, and the opportunity to object is rendered meaningless, in that interested parties are not given any particulars upon which to determine whether the Settlement Agreement is fair, reasonable and adequate and in the best interests of the Debtor's estates." Objections at 1–2. The Objector has had full discovery and has demonstrated at trial knowledge of the details of the Settlement. No more notice is required or necessary.

The Objection to The Equitable's multiple claims was mooted by The Equitable's agreement in the Settlement to claim no more than $3,529,114.39 in aggregate from all of the estates. In all events, the Objectors claim that "only Groups was a party to the Lease" and that "Equitable's claim should not be allowed as to each of TSG, TMG and TSG–80," Objections at 5, is contrary to the facts. The First Amendment of Lease, dated April 1, 1981, and the Second Amendment of Lease, dated September

1, 1981, recite that the lease was being entered into by "THE SECURITIES GROUPS, a joint venture between The Securities Group, The Monetary Group, and the Securities Group 1980 ... [each] a New York limited partnership ..." Thus, under basic partnership law, each of the estates is individually liable for the obligations of Groups under the Lease.

Finally, with regard to the Objection based upon judicial estoppel, the Objectors are putting the cart before the horse. Nothing was presented at trial which indicated that the monthly rental owed to The Equitable, which resulted from an arms-length transaction, was unreasonable or above prevailing rents for comparable commercial rentals at that time.

The Equitable accepted Groups as a tenant in a 1981 transaction that was arms length as between The Equitable and Associates. The relationship between Associates and Groups between 1979 and 1981 is another matter, and is the subject of a separate dispute between these Objectors and the estates.

It is simply premature to discuss whether the Trustee may argue that a different result pertains in analyzing a transaction between different parties at a different time. Therefore, there is no reason to strike ¶ 5.02 of the Settlement at this time and the Court will leave that matter for another day.

The Court will enter a separate Order in accordance with these Findings of Fact and Conclusions of Law.

ORDER OVERRULING THE OBJECTION OF RANDALL W. ATKINS, CHARLES D. BARNETT, ORIN E. ATKINS, AND 500 PARK AVENUE ASSOCIATES TO THE AGREEMENT OF COMPROMISE AND SETTLEMENT OF CLAIMS OF THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES

In accordance with the separately entered Findings of Fact and Conclusions of Law, it is

ORDERED that the objection of Randall W. Atkins, Charles D. Barnett, Orin E. Atkins, and 500 Park Avenue Associates to the agreement of compromise and settlement of the claims of The Equitable Life Assurance Society of the United States is overruled.