In re The SECURITIES GROUP
1980, Debtor.

Louis LOWIN, Trustee of the Estate of The Securities Group 1980, Plaintiff,

v.

DAYTON SECURITIES ASSOCIATES, Defendant and Third Party Plaintiff,

v.

Kenneth T. KALTMAN, et al., Third Party Defendants.

Bankruptcy Nos. 84–431–BK–J–GP, 84–428, 84–431 and 84–433.
Adv. Nos. 85–214, 87–303 to 87–305.

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

Feb. 20, 1991.

876

George E. Ridge, Jacksonville, Fla., for post-confirmation administrator, Louis Lowin.

Robert L. Young, Orlando, Fla., for Aircraft Investment Associates, et al.

Ira Rubin, Dayton, Ohio, for Dayton Securities Associates.

Roy Babitt, Phillip A. Kantor, co-counsel, New York City, for PM Associates, et al.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

1. TSG, TMG and TSG80 were three New York limited partnerships (sometimes referred to herein as the "Limited Partnerships") that were formed by Charles Agee Atkins. These Limited Partnerships were the general partners of The Securities Groups ("Groups"), a New York general partnership.

2. Groups began its operations as a joint operating account which coordinated the activities of TSG and TMG. After TSG80 was formed, its activities were also coordinated through Groups.

3. Among other things, Groups was a broker-dealer which invested in United States government securities. Under tax laws in effect until the early 1980s, income from these investments was deferred from year to year. Thus, TSG, TMG and TSG80 (as the general partners of Groups) were not required to recognize this income on an annual basis, although they were allowed to take immediate advantage of certain tax benefits arising from Groups' investments.

4. The defendants herein purchased interests in the Limited Partnerships by making initial capital contributions ("Initial Capital Contributions") and agreeing to make additional capital contributions ("Additional Capital Contributions") to those Partnerships in varying amounts, thereby becoming limited partners of TSG, TMG and TSG80. As such they took certain tax advantages and these tax advantages were their primary reason for investing in TSG, TMG and TSG80.

## AN OVERVIEW

5. Pursuant to the Limited Partnership Agreements signed by the defendants and the Certificates of Limited Partnership filed with the County Clerk of New York County, New York, the defendants agreed to be personally and severally liable for Additional Capital Contributions to the Limited Partnerships in an amount equal to 300% of their Initial Capital Contributions. These Additional Capital Contributions were to be paid within 30 days after receiving a written capital call from the Limited Partnerships.[1]

6. Mr. Atkins (who was the founder of Groups and the Limited Partnerships) testified about the tax significance of the Additional Capital Contribution liability assumed by each limited partner. He noted that "an individual would commit $150,000 in cash as an investment and subsequently have an obligation to the firm for three times that amount, potentially, and therefore, the limited partner would potentially be able to take tax losses four times the

amount of his original cash investment with the firm."

7. Similarly, Ira Kevelson (an expert witness called on behalf of certain defendants) testified that ordinarily, a limited partner's tax write-off could only be equal to the amount of his investment. However, if the limited partner was potentially liable for a loss in the amount of three times his actual investment, he was able to take a tax write-off equal to four times his investment.

8. The importance of the defendants' responsibility to pay Additional Capital Contributions is further reflected by the following statement which appeared in Groups' 1980 Annual Report:

> [The] General Partners' [i.e., TMG, TSG and TSG80] net subscribed capital includes callable capital commitments of $173,657,000 which represent contractual obligations of [TMG, TSG and TSG80] limited partners to contribute additional capital to satisfy recourse debt obligations of [TMG, TSG and TSG80]. The General Partners [i.e., TMG, TSG and TSG80] are jointly and severally liable for all obligations of [Groups].

9. After the defendants purchased their interests in the Limited Partnerships by making Initial Capital Contributions, Groups (and by extension, its general partners) became indebted to various creditors.

10. In early 1982, Mr. Atkins solicited the consent of the limited partners of TMG, TSG and TSG80 to an amendment of the Limited Partnership Agreements for these entities. In his March 8, 1982 solicitation letter, he stated that

> The General partners believe that all of the firm's existing and anticipated activities are within the scope and authority of its Limited Partnership Agreement. However, in order to make it clear that the Partnership may engage in these and such other business activities as the General Partners believe appropriate and desirable, the General Partners are now

---

1. These obligations were also referenced and explained in the Private Offering Circulars for TSG; TMG; and TSG80.

proposing that Section 1.03 of the Limited Partnership Agreement be amended to read as set forth in the attached form of Consent.

11. The "attached form of Consent" referred to in Mr. Atkins' letter expanded the "Business and Purposes" sections of the Limited Partnership Agreements to include "any and all business activities as may be permitted by law...." A sufficient number of limited partners executed the Consent forms to allow for the amendment of the Limited Partnership Agreements.[2]

12. Prior to the autumn of 1982, it became apparent that changes in the tax laws would no longer permit broker-dealers such as Groups to continue to defer income from year to year as had previously been the practice. These changes would translate into adverse tax consequences for the defendants who, as limited partners in the Limited Partnerships, would now be required to recognize previously unrecognized income attributable to TSG, TMG and TSG80 as the general partners of Groups. This income recognition would obligate the limited partners to pay taxes on that income without receiving equivalent cash distributions from the Limited Partnerships in an amount adequate to pay the taxes.

13. In connection with the potential tax liabilities faced by the defendants, Mr. Atkins and others eventually decided to create a new partnership which would purchase the limited partnership interests of the defendants. This new partnership was formed under New York law in November 1982 and it was known as TSG Partners.

14. On November 15, 1982, TSG Partners offered to purchase all of the interests of the limited partners of TSG, TMG and TSG80 for an amount equal to 105% of the net asset value of the Limited Partnerships as of September 30, 1982 and the assumption of the limited partners' responsibility for Additional Capital Contributions "to satisfy recourse obligations of [TSG, TMG and TSG80] of approximately $270,000,-000." However, the defendants were specifically advised that if they accepted the tender offer they would still be responsible for the liabilities and obligations of the Limited Partnerships: "*A Seller will, however, remain liable to creditors of his Partnership and The Securities Groups* as described in the next paragraph."

15. The "next paragraph" in TSG Partners' tender offer provided that

As soon as practicable after the Closing Date, the [Limited] Partnerships intend to file amendments to their respective Certificates of Limited Partnership to delete the Sellers as Limited Partners. *This will not affect the rights of then existing creditors of the Partnerships, who may have the right to make a direct claim against a Seller for up to the amount of his Additional Capital Commitment if the Partnerships do not pay such creditors.* [emphasis supplied]

16. The tender offer also disclosed that as of September 30, 1982, TSG Partners had a net worth of approximately $28,750,-000 and "it will have no assets other than [the defendants' limited partnership interests to be purchased]. Accordingly, the liabilities of [TSG Partners] created or incurred pursuant to this Offer will substantially exceed its assets and [TSG Partners] may not be able to meet the obligations undertaken by it pursuant to this offer."

17. TSG Partners' tender offer also warned: **"LIMITED PARTNERS WHO ACCEPT THIS OFFER MAY CONTINUE TO BE LIABLE FOR CERTAIN OBLIGATIONS OF THEIR PARTNERSHIPS UNDER CERTAIN CIRCUMSTANCES."** In this regard, Allan Rinzler, who was the managing partner of defendants Dayton Securities Associates, Dayton Monetary Associates and Dayton Brokerage Associates, testified:

Q: Were you aware of the fact that limited partners who accepted the offer, the tender offer, in November of 1982, might continue to be liable for certain obligations of their part-

---

**2.** The defendant Dayton Securities Associates was among the limited partners who consented to the amendment.

nerships under certain circumstances?

A: I believe I was, yes.

18. On January 3, 1983, the defendants and TSG Partners consummated the tender offer transaction. TSG Partners issued them appropriate promissory notes. On April 1, 1983, TSG Partners paid the defendants five percent of the amounts owed on these promissory notes.[3]

19. At the time that the defendants sold their interests to TSG Partners (thereby receiving a return of their Initial Capital Contribution), many of the creditors of Groups and the Limited Partnerships were unpaid. These creditors remain unpaid today.

## PROCEDURAL HISTORY

20. In 1984, TSG, TMG, and TSG80 filed Petitions in this court under Chapter 11 of the Bankruptcy Code. Louis Lowin was later appointed as the Trustee of these estates.

21. On August 15, 1985, Louis Lowin (in his former capacity as Chapter 11 Trustee for the bankrupt estates) made a written call on all limited partners, as required by the Limited Partnership Agreements, for Additional Capital Contributions. The limited partners refused to honor this call.

22. Based in part upon the limited partners' failure to comply with the August 15, 1985 demand, Louis Lowin (in his representative capacity) sought relief in four separate adversary proceedings, briefly identified as follows:[4]

*Lowin v. Dayton Securities Associates;* Adversary No. 85–214 (filed in the TSG80 Estate);

*Lowin v. Midas Limited Partnership, et al.,* Adversary No. 87–303 (filed in the TMG Estate);

*Lowin v. Norman Lear, et al.,* Adversary No. 87–304 (filed in the TSG80 Estate); and

*Lowin v. P.M. Associates, et al.,* Adversary No. 87–305 (filed in the TSG Estate).

23. The claims asserted in *Lowin v. Dayton Securities Associates* are essentially identical to the claims filed in the other three consolidated adversary proceedings. In each case, two Counts have been pled against the defendants.

## COUNT I

24. Count I in the Complaints filed against the defendants in these consolidated adversary proceedings is based primarily upon Section 106(4) of the New York Limited Partnership Law [McKinney's Partnership Law Book 38, Article 8] ("the New York Act"). This statute provides in part that

When a contributor has rightfully received the return in whole or in part of the capital of his contribution, *he is nevertheless liable for any sum,* not in excess of such return with interest, *necessary to discharge its liabilities to all creditors who extended credit or whose claims are before such return.* [emphasis supplied]

25. As this court has previously stated, the plaintiff contends that Section 106(4) of the New York Act "creates an obligation on the part of defendants to return to the [Limited] Partnership[s] the consideration they received in exchange for their partnership interests under the terms of the tender offer made by TSG Partners."

26. Prior to the trial of these consolidated cases, the plaintiff filed a Motion for Partial Summary Judgment as to Count I of the Complaints. By an August 9, 1988 Order (based upon a separately entered Memorandum Opinion),[5] this court granted that Motion as to the defendants' liability

---

**3.** January 3, 1983, is the effective date of the tender offer as among TSG Partners and the defendants, *inter se.* The rights of creditors against the defendants were not affected until April and July 1983 when Limited Partnership Certificates were amended to show the withdrawal of the defendants.

**4.** On April 5, 1988, this court entered an Order whereby these four cases were consolidated for trial.

**5.** This Memorandum Opinion is reported at 91 B.R. 143 (M.D.Fla.1988).

under Count I of the Complaints filed herein. Specifically, the court ruled that "[s]hould it be finally determined that there is a shortfall in partnership assets so that creditors existing at the time defendants assigned their interests remain unpaid, the defendants will be directed to turn over a sum not to exceed the amount of capital contributions returned plus interest." (August 9, 1988 Order Granting Plaintiff's Motion for Partial Summary Judgment as to First Cause of Action (Liability Only)).

27. Based upon this court's August 9, 1988 Order and Memorandum Opinion, the following factual issues regarding "Count I damages" remain to be determined for each of these consolidated cases:

(a) When the defendants assigned their limited partnership interests to TSG Partners on January 3, 1983, what were the liabilities to creditors for each Limited Partnership at that time (and what are the present unpaid amounts of those liabilities);

(b) What are the assets currently available to satisfy the unpaid liabilities;

(c) In the event of a shortfall in assets versus unpaid creditor liabilities (which is in fact the case), what amounts of capital contributions were returned to each defendant; and

(d) What is the resulting amount of damages that each defendant is responsible for and what is the corresponding amount of interest due.

*Liabilities of the Limited Partnerships as of January 1983*

The Equitable Claim

28. In January 1985, The Equitable Life Assurance Society of the United States ("The Equitable") filed an Amended Proof of Claim in the Groups estate for $16,332,-176.18 based upon Group's rental of office space at 500 Park Avenue in New York. The rental of this office space was directly associated with the business conducted by Groups and its constituent partnerships. Based upon the fact that TSG, TMG and TSG80 were general partners of Groups, The Equitable also filed a $16,332,176.18 Proof of Claim in each of the estates for these entities.[6] *In re The Monetary Group,* 73 B.R. 630, 632 (M.D.Fla.1987), *aff'd* 91 B.R. 138 (M.D.Fla.1988).

29. The Equitable's claims were based upon Groups' execution of a 10 year lease dated December 31, 1979, effective as of February 15, 1980 and expiring on March 1, 1990.[7] The material terms of this lease were disclosed in Groups 1980 Annual Report.

30. In 1983, Groups became in arrears on its lease payments to The Equitable.

31. On May 22, 1987, this court entered an Order approving a settlement reached between The Equitable and the Post–Confirmation Administrator for Groups, TMG, TSG and TSG80, "whereby The Equitable reduced its claims in each of the estates to $3,529,114.39 and acknowledged that the payment of that sum would constitute full payment of all its claims." *In re Monetary Group,* 73 B.R. at 632.

32. Since May 22, 1987, The Equitable claim has been reduced by payments totaling $1,004,033, leaving an unpaid balance of $2,525,081.[8]

33. Since each of the Limited Partnerships is jointly and severally liable for the obligations of Groups,[9] TMG, TSG and TSG80 are each responsible for $2,525,081 of the debt owed to The Equitable, based upon an obligation which existed prior to January 3, 1983.

---

**6.** This court has previously determined that "[a]s the general partners of Groups, [TSG, TMG and TSG80] are jointly liable for the debts incurred by Groups."

**7.** Groups' original lease agreement was for the 10th and 11th floors of the 500 Park Avenue Building. By an April 1, 1981 amendment to the lease, Groups also leased the 9th floor of that Building and in September 1981, Groups'

lease obligations were assigned to The Equitable. *In re Monetary Group,* 73 B.R. at 631.

**8.** The Court has taken judicial notice of the Confirmed Plan Status Reports to include all payments made to Equitable.

**9.** *See In re Monetary Group,* 73 B.R. at 636.

34. TSG Partners' tender offer disclosed to these defendants their liability to The Equitable. Specifically, the offer warned that "existing creditors ... may have the right to make a direct claim against a seller for up to the amount of his Additional Capital Contribution if [TSG, TSG80 and TMG] do not pay such creditors." The tender offer further cautioned that "[s]ome creditors have extended credit to The Securities Groups, [TSG, TSG80 and TMG] or affiliates thereof, the liability for which will continue for an extended period of time beyond [January 3, 1983]. *For example, The Securities Groups is obligated under office leases which expire in March 1990 and which require minimum annual rentals for the duration of such leases aggregating approximately $10,700,000.* The leases also provide for rent escalation for certain changes."

The SoCal Claim

35. In November 1984, Southern California Savings and Loan Association ("SoCal") filed a proof of claim in the Bankruptcy estate for Groups (Claim No. 207) for over $19 million on account of Groups' December 1982 purchase of SoCal from City Investing Company ("City").

36. The Post–Confirmation Administrator contested the dollar amount of Claim No. 207. The defendants in the present consolidated cases also asserted Objections to Claim No. 207, challenging both the legal sufficiency and the dollar amount of that Claim.

37. On November 16 and 17, 1989, all objections to Claim No. 207 were tried before this court. Counsel for the parties in the instant consolidated cases appeared and participated as Objectors to Claim No. 207 and these parties, by their counsel, also filed post-trial Briefs and proposed Findings of Fact and Conclusions of Law. Moreover, substantially the same proofs at the evidentiary hearing on the objections to Claim No. 207 were heard by this court at the trial of these consolidated adversary proceedings.

38. On June 28, 1990, this court entered an Order allowing SoCal's Claim in the amount of $7,014,103. This Order was based upon separately entered Findings of Fact and Conclusions of Law as to Objections to Claim No. 207 ("SoCal Opinion").[10]

39. In the fall of 1982, Groups negotiated for the purchase of SoCal from City. Under the terms of a November 10, 1982 Purchase Agreement, Groups agreed to pay City $27 million for SoCal's stock.

40. On November 15, 1982, a joint application was submitted to the Federal Home Loan Bank Board ("FHLBB") by Groups, TSG, TMG, TSG80, NTG, Ameribond Securities Associates and Finance Limited Partnership for approval to acquire SoCal's stock. In a December 7, 1982 amendment to their joint application, those applicants stipulated that they

will cause the net worth of [SoCal] to be maintained at a level consistent with that required by Section 563.13(b) of the Rules and Regulations for Insurance of Accounts, ... and, as necessary, will infuse sufficient additional equity capital, in a form satisfactory to the supervisory agent, to effect compliance with such compliance.

41. On December 14, 1982, the joint application to acquire SoCal's stock was approved, subject to the condition that:

The applicants will cause the net worth of [SoCal] to be maintained at a level consistent with that required ... by Section 563.13(b) of the Rules and Regulations Board for Insurance of Accounts, as now or hereafter in effect, and where necessary, will infuse sufficient additional equity capital to effect compliance with such requirements.

(SoCal Opinion at p. 4).

42. The sale closed on December 23, 1982. In conjunction with this transaction,

---

**10.** At the trial of the present consolidated adversary proceedings, the defendants' counsel argued that claims which had been objected to should first be determined in a contested matter context *before* the defendants' ultimate liability was decided in the instant litigation. While the court rejected this argument it is noteworthy that the very procedure advocated by the defendants has taken place with the SoCal Claim, the Morgan Bank Claims, and Leonard Levie's Claims.

Groups appointed National Trust Group ("NTG") to hold SoCal's stock and NTG issued two promissory notes to City related to the sale of SoCal. Nevertheless, Groups remained a primary obligor on the purchase agreement. Thus, Groups was fully responsible for the liabilities formally incurred on December 23, 1982.

43. On December 22, 1983, Groups and Atkins transferred certain assets to NTG. In turn, NTG transferred these assets to SoCal in exchange for SoCal's agreement to pay a portion of Groups' and NTG's liability on account of the 1982 Purchase Agreement. That payment took place on December 23, 1983, when SoCal transmitted $13.2 million which was then paid to City.

44. In June 1985, the FHLBB appointed the Federal Savings and Loan Insurance Corporation ("FSLIC") as receiver for SoCal. Consequently, SoCal's claims were transferred to FSLIC which later brought two lawsuits against former directors and officers of SoCal: *FSLIC v. Loeffler* and *FSLIC v. Huang*. FSLIC subsequently received funds in settlement of these lawsuits and other claims and of those sums, the court has determined that $6,157,897 should be applied as a credit against Claim No. 207. Thus, the remaining amount of that Claim which Groups is now liable for is $7,014,103.

45. Groups' liability is premised upon the breach of its December 7, 1982 commitment to maintain the net worth of SoCal at the level mandated by applicable regulations. (SoCal Opinion at p. 12). Groups' liability is also premised upon the obligation which it assumed under the November 10, 1982 Purchase Agreement. In this regard, "NTG's tender of promissory notes to City in 1982 and 1983 did not extinguish Groups' obligation under the [November 10, 1982] purchase agreement with City. That obligation could only be extinguished by agreement in writing by City."

46. Groups liability on Claim No. 207 in the amount of $7,014,103 is a joint and several obligation of TMG, TSG and TSG80 as general partners of Groups. This liability was incurred prior to January 3, 1983

and TSG Partners' November 15, 1982 tender offer specifically disclosed this liability by advising that Groups "recently signed an agreement for the acquisition, by it or its designee, of [SoCal]. Under the agreement, The Securities Groups is obligated to pay $27,000,000 plus interest for all of the stock of [SoCal]."

The Morgan Bank Claims

47. In October 1984, the Morgan Bank (Delaware) ("Morgan Delaware") filed a proof of claim in the estate for Groups based upon Groups' guaranty of a loan made to The Leasing Group, Inc. ("Leasing"). Based upon the fact that TMG, TSG and TSG80 were general partners in Groups, Morgan Delaware also filed proofs of claims in each of these estates based upon the indebtedness owed by Groups.

48. In October 1984, Morgan Guaranty Trust Company of New York ("Morgan Guaranty") filed a proof of claim in the Estate for Groups based upon Groups' guaranty of loans made to Leasing. Based upon the fact that TSG, TMG and TSG80 were general partners of Groups, Morgan Guaranty also filed proofs of claims in each of these estates based upon the indebtedness owed by Groups.

49. The claims submitted by Morgan Delaware and Morgan Guaranty (collectively referred to as the "Morgan Banks") were subsequently amended, whereby Morgan Guaranty claimed a principal balance due of $2,057,145.36 (plus pre-petition and post-petition interest, attorneys' fees and costs) and Morgan Delaware claimed a principal balance of $1,303,171.34 (plus pre-petition and post-petition interest, attorneys' fees and costs).

50. Limited partner defendants in these consolidated actions filed objections to the Morgan Bank claims and on August 25, 1988, a trial on those objections was held before this court. Based upon the evidence presented at that trial, *in addition to the evidence submitted during the trial of these consolidated adversary proceedings on July 28 and 29, 1988,* the court entered a January 3, 1989 Memorandum Opinion and an Order Overruling Objection to Claims of Morgan Guaranty Trust Compa-

ny of New York and Morgan Bank (Delaware). *In re Monetary Group*, 95 B.R. 803 (M.D.Fla.1989).[11]

51. Just as the court found in its January 3, 1989 Memorandum Opinion, the court again finds that Leasing was Groups' wholly-owned subsidiary which was created to take advantage of opportunities in the equipment leasing business. This business "related to Groups' overall investment strategy by 'providing both leases and loans for the acquisition of capital goods. The Company, while adding to its own portfolio, will also prepare and manage single investor leases and leveraged leases for participation by investors.' " [12]

52. In November 1980, Groups solicited loans from the Morgan Banks to provide financing for Leasing's contemplated activities. At that time, Groups' general partners informed the Morgan Banks that Leasing had been created by Groups "to engage in lease financing and transactions which would provide tax benefits for the limited partners of Groups."

53. Leasing's capitalization was insufficient to warrant any extension of credit. However, Groups' credit could support the proposed loans to Leasing.

54. The Morgan Banks decided to approve loans to Leasing based upon Groups' guaranty of these loans and the ability of TSG, TMG and TSG80 to call for Additional Capital Contributions from the limited partners.

55. The Morgan Banks ultimately extended three loans to Leasing, totalling almost $7.4 million. The first loan was made on August 11, 1981, in the amount of $2.5 million. The second was made on August 31, 1981 for $2.5 million and the third loan was made on January 15, 1982 for $2,361,997.13.

56. Groups unconditionally guaranteed these obligations to the Morgan Banks by written contracts executed in August 1981 and January 1982. Steven R. Hageman and Robert F. Gubitosi, both general partners and members of the executive committee of Groups, executed the separate guarantees supporting the three loans.

57. Both Mr. Hageman and Mr. Gubitosi testified that in addition to having the legal authority of a general partner to act for the partnership, they were authorized by Groups' managing partner (Mr. Atkins), to execute the guarantees. Mr. Atkins did not dispute the authority of the general partners to execute the guarantees, the validity of the guarantees, or the relationship between the guarantees and Groups' business.

58. The Morgan Banks' loans were made to finance Leasing's purchase and lease of three oil drilling rigs. Each loan was secured by this oil drilling equipment, in addition to Groups' unconditional guaranty.

59. The oil drilling rigs were leased to Empire Oil & Gas Company ("Empire Oil"). In September 1982, Empire Oil filed a petition for relief under Chapter 11 of the Bankruptcy Code and in conjunction with this development, Empire Oil stopped making lease payments to Leasing. Consequently, Leasing was unable to meet its obligations to the Morgan Banks.

60. Despite Leasing's inability to meet its monthly obligations, there were no interruptions in payments to the Morgan Banks because Groups acted promptly to service the debt (pursuant to the guarantees which it had given to the Morgan Banks in 1981 and 1982). Groups continued to make such payments for over two years and during this time, it repeatedly ratified its financial obligation to the Morgan Banks.

61. In March 1984, Groups announced that it would no longer make payments to the Morgan Banks. Eventually, the Morgan Banks were permitted to pursue foreclosure suits against the equipment, resulting in a public auction of the oil drilling

---

11. Affirmed on April 24, 1990 by an Order entered by the United States District Court for the Middle District of Florida.

12. Robert Gubitosi, who was Groups' Chief Financial Officer, testified that Leasing was formed "[t]o earn interest rate differentials on leases that were put out."

rigs. The proceeds of that auction were applied to offset Groups' liability to the Morgan Banks. The remaining principal debt owed to Morgan Guaranty was $2,057,145.36 and the remaining principal debt owed to Morgan Delaware was $1,303,171.34.

62. By its January 3, 1989 Order, this court overruled the defendants' objections and allowed the Morgan Banks amended claims in each Estate. The total amount of both claims is $3,507,760.34.[13]

63. On July 2, 1990 the court ruled that a distribution could be made to the Morgan Banks during the pendency of the Appeal. Said distribution was made on September 17, 1990 in the total amount of $987,785, thus leaving an unpaid balance of $2,519,975.[14]

64. The total $3,507,760.34 debt owed to the Morgan Banks by Groups and its general partners is based upon loan obligations to the Morgan Banks which existed prior to January 3, 1983, when the defendants withdrew as limited partners in conjunction with their acceptance of TSG Partners' November 15, 1982 tender offer.

65. TSG Partners' November 15, 1982 tender offer specifically disclosed to these defendants their liability to the Morgan Banks. The tender offer warned that "existing creditors ... may have the right to make a direct claim against a seller for up to the amount of his Additional Capital Commitment if [TSG, TSG80 and TMG] do not pay such creditors." The tender offer further cautioned that "[s]ome creditors have extended credit to The Securities Groups, [TSG, TSG80 and TMG] or affiliates thereof, the liability for which will continue for an extended period of time beyond [January 3, 1983]. For example, ... *Groups has guaranteed through 1986 debts of The Leasing Groups, Inc.*, a sub-sidiary, in the amount of approximately $11,700,000."

The Chemical Bank Claim

66. In August 1984, Chemical Bank filed a $631,720.97 proof of claim in the Groups estate. Based upon the fact that TSG, TMG and TSG80 were general partners of Groups, Chemical Bank also filed a $631,720.97 proof of claim in each of these estates for these entities.

67. Chemical Bank's claims were based upon Groups' guaranty of loans extended to Legal Management, Inc. ("Legal Management").[15]

68. In 1981, Legal Management had sought financing from Chemical Bank to establish an office facility and provide services for individual lawyers and small law firms. At that time, Legal Management's financial structure would not support the requested loan.

69. In early 1982, Legal Management again sought financing from Chemical Bank, requesting a $600,000 line of credit that would be guarantied by Groups.[16]

70. In April 1982, Chemical Bank decided to extend a $600,000 construction line of credit based upon Groups' guaranty of this indebtedness. In considering that guaranty, Chemical Bank placed significant weight upon the fact that Groups' general partners (i.e., TSG, TMG and TSG80) could call for Additional Capital Contributions from their limited partners.

71. At the April 19, 1982 closing of Chemical Bank's loan to Legal Management, Groups (acting through Robert Gubitosi) executed a guaranty of that loan. At that time, Mr. Gubitosi (who was Groups' Chief Financial Officer) was a general partner of both TMG and TSG80 (two of Groups' general partners) and he executed the guaranty in that representative capacity. Furthermore, he was authorized to

---

13. In this regard, the court's January 3, 1989 Order states that the Morgan Banks "shall be allowed but one recovery in these Chapter 11 Estates. The court also ruled that "[t]he determination as to the allowance of any post-petition interest, attorneys' fees and costs shall be left to a later time."

14. The Court has taken judicial notice of the payment made to the Morgan Banks' escrow account.

15. Legal Management, Inc. later changed its name to "Legal Facilities Management, Inc."

16. In conjunction with this guaranty, Groups received 50% of Legal Management's stock.

sign this guaranty by Groups' Executive Committee.

72. From April 1982 until December 21, 1982, Chemical Bank loaned Legal Management the principal amount of $505,000, as evidenced by demand notes attached to Chemical Bank's proofs of claim.[17]

73. In 1983, Chemical Bank demanded full payment from Legal Management. On August 10, 1983, Chemical Bank also demanded full payment from Groups in its capacity as guarantor of the Legal Management loans. Groups failed to make any payment and the Chemical Bank loan remains unpaid.

74. As reflected by its proof of claim, Chemical Bank is seeking to recover a total of $550,041.19 in principal and accrued interest for loan obligations which existed prior to January 3, 1983. The court finds that Groups is liable for this debt as the guarantor of Leasing Management's loans. Additionally, TMG, TSG and TSG80 are each responsible for this unpaid debt in their capacity as general partners of Groups.

The 767 Third Avenue Associates Claim

75. In September 1984, 767 Third Avenue Associates ("767 Third Avenue") filed a $2,234,060.74 proof of claim in the Groups estate. Based upon the fact that TSG, TMG and TSG80 were co-obligors with and general partners of Groups, 767 Third Avenue also filed a $2,234,060.74 proof of claim in each of the estates for these entities. *None of these defendants objected to those claims.*

76. 767 Third Avenue's claims were based upon Groups' guaranty of a July 21, 1981 lease signed by Ameribond Securities Associates ("Ameribond"), whereby the 39th and 40th floors of a New York City building were leased for a 5 year period. That lease commenced on November 1, 1981 and the payments due under the lease would have reimbursed 767 Third Avenue

for the $250,000 to $350,000 which was spent to build out the premises prior to the commencement date.

77. In 1982, Ameribond became a general partner of Groups and on August 9, 1982, Groups guaranteed Ameribond's lease obligations in exchange for the landlord's consent to allow Ameribond to sublet a portion of the leased premises to Fugazy Express, Inc.[18]

78. On August 26, 1986, a Stipulation Settling Claims was executed by 767 Third Avenue and Louis Lowin as the Post–Confirmation Administrator, whereby the $2,234,060.74 claims filed in the estates for Groups, TSG, TMG and TSG80 were reduced to the amount of $647,754.88 in each estate (with the provision that payment of this amount would constitute full payment of all 767 Third Avenue claims).

79. Since August 26, 1986, the 767 Third Avenue claim has been reduced by payments totalling $184,286, thus leaving a current unpaid balance of $463,468.[19]

80. Since each of the Limited Partnerships are both jointly and severally liable for the obligations owed to 767 Third Avenue, TSG, TMG and TSG80 are each responsible for the $463,468 unpaid debt now owed to 767 Third Avenue. As set forth above, this debt is based upon a lease obligation which existed prior to January 3, 1983, when the defendants withdrew as limited partners in conjunction with their acceptance of TSG Partners' November 15, 1982 tender offer.

81. The November 1982 tender offer advised the defendants of their liability to 767 Third Avenue. Specifically, the offer warned that "existing creditors … may have the right to make a direct claim against a seller for up to the amount of his Additional Capital Commitment if [TSG, TSG80 and TMG] do not pay such creditors." The tender offer further cautioned that "[s]ome creditors have extended credit

---

17. On January 10, 1983, Chemical Bank loaned Legal Management an additional $75,000.

18. This guaranty was also signed by TMG, TSG and TSG80, each of whom agreed to be jointly and severally liable thereunder.

19. The Court has taken judicial notice of the Confirmed Plan Status Reports to include all payments made to 767 Third Avenue.

to The Securities Groups, [TSG, TSG80 and TMG] or affiliates thereof, the liability for which will continue for an extended period of time beyond [January 3, 1983]. For example, *The Securities Group has ... guaranteed obligations of Ameribond Securities Associates, a partner in The Securities Groups, under an office lease which expires in October 1986. The minimum rental for such lease is approximately $600,000.* This lease also provides for rent escalation for certain charges."

The Chase Bank Claim

82. In November 1984, The Chase Manhattan Bank, N.A. ("Chase Bank") filed a proof of claim in the Groups estate. This claim was based upon the trading activities of Groups in United States government securities.

83. Up to and including early 1982, Groups lent certain sums of money to Drysdale Government Securities, Inc. ("Drysdale") and as security for these loans, Groups held government securities owned by Drysdale. A May 15, 1982 interest payment on these securities was made to Groups since it held the securities and in turn, Groups was to transmit this interest payment to Drysdale. However, Groups failed to do so.

84. In mid-May 1982, Drysdale failed to repay its loans from Groups and on May 19, 1982, Groups liquidated (i.e., sold) the Drysdale securities which it held as collateral.

85. After Groups liquidated the securities, the May 15, 1982 interest payment and the money received from the sale of securities (in excess of Drysdale's indebtedness to Groups) should have been paid to Chase Bank (based upon Drysdale's assignment of its securities positions to Chase Bank). The total amount due to Chase Bank equalled $2,335,500.48.

86. Chase Bank's claim against Groups seeks the recovery of the $2,335,500.48 referred to above plus an additional $207,784.24 based upon Groups' failure to timely pay other interest amounts ("failed transactions") owed in May 1982 in connection with the trading of United States governments securities.

87. The evidence presented establishes that Groups owed Chase Bank $2,543,284.72 as of May 1982. TSG, TMG and TSG80, as the general partners of Groups, are each responsible for this debt, which remains unpaid.

The Leonard Levie Claims

88. In 1984, Leonard Levie filed proofs of claims in the estates for Groups, TSG, TSG80 and TMG, based upon his employment with these entities from early 1979 until September 1981. The Post–Confirmation Administrator objected to these Claims and on August 22, 1989 and February 22, 1990, these objections were tried before this court.

89. On July 9, 1990, the court entered an Order on Levie's claims, determining that "the total claim applicable to all four estates is allowed in the amount of $529,436.66, plus interest through May 25, 1984." This Order was based upon separately entered Findings of Fact and Conclusions of Law ("Levie Opinion").

90. Levie joined TSG as a trader in the early part of 1979. At that time, he was offered a three year employment contract which included provisions for base salary and a formula for determining a bonus based upon net trading profits.

91. In October 1979, Levie entered into another employment agreement with TMG and a revised employment agreement with TSG. These agreements provided that Levie would receive a bonus equal to 3% of net trading profits.

92. Shortly after entering into the revised employment agreement with TSG and the new employment agreement with TMG, Groups was created. The general partners of Groups informed Levie that he would act as a trader for Groups and that all of his trades would be handled through Groups.

93. After the formation of TSG80 in November 1980, it too became a general partner of Groups. Levie was informed that he would be responsible for trades on behalf of TSG80 as well as the other constituent partnerships and that his bonus

calculations would be based upon the combined results of all of the partnerships.

94. Although Levie received a $100,000 bonus in 1980, he was entitled to an additional $146,300. He did not receive a bonus in 1981, although he was entitled to one on a pro rated basis in the total amount of $303,136.66.

95. By its July 9, 1990 Order, in addition to those matters discussed in the Levie Opinion, the court has concluded that Groups is responsible for the bonus owed to Levie in the total amount of $529,436.66 and that this liability is equally shared by TSG, TMG and TSG80. Moreover, this indebtedness was incurred prior to January 3, 1983, when the defendants in the present consolidated adversary proceedings withdrew limited partners.

96. Since July 9, 1990, the Levie Claim has been reduced by payments totally $150,624, thus, leaving a current unpaid balance of $378,813.[20]

The James Stewart Polshek Claim

97. On October 31, 1984, James Stewart Polshek and Partners, Architects ("the Architects") filed a $70,969.35 Proof of Claim in each of the Estates for Groups, TSG, TSG80 and TMG. These claims were based upon services provided by the Architects for designing the Debtors' offices at 500 Park Avenue; New York, New York.

98. The invoices attached to the Architects' Proofs of Claim establish that between August 1981 and December 1982, the Architects provided over $75,000 in commercial services to the Debtors and billed for these services accordingly.[21]

99. Initially, the Post–Confirmation Administrator filed Objections to the Architects' Claims. On October 14, 1986, these parties filed a Stipulation Settling Claims, whereby they agreed that each Claim would be reduced to $7,000 and that the payment of $7,000 shall constitute payment in full of all of the Architects' Claims.

100. Since August 26, 1986, the Architects' claim has been reduced by payments totalling $1,992 thus leaving a current unpaid balance of $5,008.[22]

The Cralin Asset Management Claim

101. On August 27, 1984, Cralin Asset Management, Inc. ("Cralin Asset") filed a $150,000 Proof of Claim in the Groups Estate, based upon a December 23, 1982 margin deposit (in the amount of $150,000) placed with Groups. That deposit was not returned and no payments were received by Cralin Asset.

102. The Post–Confirmation Administrator objected to Cralin Asset's Claim but on September 3, 1986, these parties filed a Stipulation Settling Claim, agreeing to a reduction of Cralin Asset's Claim to the sum of $120,000.00. Since each of the Limited Partnerships is both jointly and severally liable for the obligations of Groups, TMG, TSG and TSG80 are each responsible for the $120,000 debt owed to Cralin Assets. This debt is based upon a margin deposit placed with Groups prior to January 3, 1983.

103. Since August 26, 1986, Cralin Asset's claim has been reduced by payments totalling $5,736 thus leaving a current unpaid balance of $114,264.[23]

*A Summary of Joint and Several Liabilities as of January 3, 1983*

104. TSG, TSG80 and TMG are jointly and severally liable for those obligations discussed above, all of which are based upon debts incurred before January 3, 1983 (when the limited partner defendants in these cases contend that they withdrew from the Limited Partnerships). The unpaid amounts of those obligations are summarized below:

---

20. The Court has taken judicial notice of the Confirmed Plan Status Reports to include all payments made to Levie.

21. The same invoices reflect payments totalling approximately $8,400.

22. The Court has taken judicial notice of the Confirmed Plan Status Reports to include all payments made to the Architects.

23. The Court has taken judicial Notice of the Confirmed Plan Status Reports to include all payments made to Cralin Asset.

| | |
|---|---:|
| The Equitable | $ 2,525,081 |
| SoCal | 7,014,103 |
| Morgan Banks | 2,519,975 |
| Chemical Bank | 550,041 |
| 767 Third Avenue Associates | 463,468 |
| Chase Bank | 2,543,285 |
| Leonard Levie | 378,813 |
| James Stewart Polshek | 5,008 |
| Cralin Asset Management | 114,264 |
| TOTAL | $16,114,038 |

105. As explained in the Conclusions of Law, pre-judgment interest should be allowed on the amounts itemized above. Such interest, calculated at the rate of 9% per annum from December 18, 1987 through January 28, 1991, equals $4,513,697 with the result that the total outstanding amount is $20,627,735 as of January 28, 1991.

### Current Assets Available to Satisfy Unpaid Joint and Several Liabilities

106. As reflected by the Eighth Confirmed Status Reports filed in the Bankruptcy estates for the entities in question, there are insufficient assets currently available to satisfy the unpaid joint and several liabilities summarized above.[24] The amounts of all assets as of January 28, 1991 are listed below: [25]

| | |
|---|---:|
| Groups | $ 662,252.37 [26] |
| TSG | 76,932.33 |
| TSG80 | 584,546.22 |
| TMG | 817,020.46 |
| TOTAL | $2,140,751.38 |

107. Accrued administrative expenses are deductible from these assets. Consequently, the final net amount of assets available to be distributed to the creditors identified above has not yet been determined. Nevertheless, it is clear that there will be a significant shortfall in partnership assets to satisfy Class I creditors of these estates.

### What Amounts of Initial Capital Contributions Were Returned to Each Defendant

108. This court has ruled that "[s]hould it be finally determined that there is a shortfall in partnership assets so that creditors existing at the time defendants assigned their interests remain unpaid, the defendants will be directed to turn over a sum not to exceed the amount of capital contributions returned plus interest." (August 9, 1988 Order Granting Plaintiff's Motion for Partial Summary Judgment as to First Cause of Action (Liability Only)).

109. Initially, the defendants received a return of capital in two ways: first, in the form of promissory notes received from TSG Partners; and second, in the form of a five percent cash payment made on these notes. As this court has previously found, the promissory notes [that the] defendants received constitute a return of capital contributions as much as did the cash.

110. The parties have entered into and filed a Stipulation (Joint Exhibit 1) which sets forth the contributions which each limited partner defendant made to the respective Limited Partnerships in the consolidated adversary proceedings. Additionally, this Stipulation sets forth both the face amount and the principal amount of the promissory notes received by each limited partner defendant from TSG partners.

111. Since the five percent cash payment was made on and represents a partial payment of the promissory notes, the principal amount of those notes constitutes the amount of the Initial Capital Contribution returned to each defendant.[27] In each in-

---

**24.** At trial, the court was requested to take judicial notice of designated Confirmed Status Reports prepared by the Post–Confirmation Administrator and it did so. Clearly, it is proper for the court now to judicially notice the more recent Confirmed Status Reports.

**25.** The Court has taken judicial notice of all payments made from these accounts through Confirmed Plan Status Reports and previous orders of this Court regarding administrative expenses.

**26.** This figure does not take into account $6,180.29 held in Groups' Litigation Fund.

**27.** The exceptions to this general rule pertain to 6 instances in which the principal amount of the TSG Partners' note *exceeds* the amount of the Initial Capital Contribution. Those instances are: Dayton Monetary Associates contributed $2,178,750 to TMG but received a principal amount of $2,564,461; Litchfield Associates contributed $326,648 to TMG but received a principal amount of $329,184; Bernard Barnett con-

stance, the amount of the Initial Capital Contribution returned is significantly less than the approximate $18.3 million shortfall in assets.[28] Therefore, since each limited partner defendant is liable for that shortfall up to "a sum not to exceed the amount of capital contributions returned plus interest," [29] it is clear that *at a minimum,* a judgment should be entered against each defendant in an amount equal to the Initial Capital Contribution returned *plus* interest on that amount since December 18, 1987.[30]

### The Return of Additional Capital Contributions

112. In addition to the return of Initial Capital Contributions received by the defendants in the form of promissory notes, they also received *another* return of capital in the form of Additional Capital Contribution liabilities allegedly assumed by TSG Partners. This return of capital increases the amount of each defendant's liability under Count I.[31]

113. On November 15, 1982, TSG Partners offered to assume the limited partners' responsibility for Additional Capital Contributions "to satisfy recourse obligations of [TSG, TMG and TSG80] of approximately $270,000,000."

114. Ira Kevelson (the expert witness called on behalf of certain defendants) confirmed the accuracy of TSG Partners' offer for an investor whose Initial Capital Contribution was $100,000 and whose Additional Capital Contribution liability would be $300,000: "Now, for tax purposes, what happened is the relief of $300,000 of liability is the same as being paid $300,000 in cash. So I got $300,000 from them."

115. Allan Rinzler, who was the managing partner of the defendants Dayton Securities Associates ("DSA"), Dayton Monetary Associates ("DMA") and Dayton Brokerage Associates ("DBA"), received TSG's Partners' November 15, 1982 tender offer. On November 23, 1982, he wrote to the limited partners of DSA, DMA and DBA and recommended that they accept the tender offer. In doing so, he offered the following advice:

By accepting the offer to purchase and selling our partnership interests, we should have the opportunity to terminate our investment at long term capital gain tax rates.

The purchase price will be paid on an installment basis. Since the debt obligation that each of us assumed at the time of the investment will be relieved as a part of the sale, that amount ($30,000 for each $10,000 of investment) plus the cash received (5%) will be recognized as a long term capital gain for tax year 1983.

116. Based upon the defendants purported assignment of their Additional Capital Contribution liability to TSG Partners, they clearly received a significant benefit. The reality of that benefit is underscored by two facts. First, at the time the tender offer was extended, there were outstanding recourse obligations of approximately $270,000,000. Second, the defendants were

---

tributed $135,375 to TSG but received a principal amount of $137,159; Dayton Brokerage Associates contributed $237,500 to TSG but received a principal amount of $238,421; Michael Dingman contributed $47,500 to TSG but received a principal amount of $47,832; and Senn, Solomon & Montgomery contributed $180,000 to TSG but received a principal amount of $180,405. In view of the court's earlier ruling, the court finds that these six defendants received a complete return of their capital contributions.

**28.** The total amount due is approximately $20.6 million, and the estates' current assets (without regard to other expenses) total approximately $2.1 million. The difference is approximately $18.5 million.

**29.** August 9, 1988 Order Granting Plaintiff's Motion for Partial Summary Judgment as to First Cause of Action (Liability Only).

**30.** Attached as Appendix 1 is a chart which in part sets forth the amount of Initial Capital Contributions returned to each defendant. The identity and order of the defendants on this chart corresponds to the identity and order of the defendants as set forth in the schedules attached to the Stipulation filed with the court on July 16, 1990 as Joint Exhibit 1.

**31.** This element of damages was referred to in the "Wherefore" clause in each Complaint filed in these Consolidated Adversary Proceedings. This element of damages is also discussed in the Conclusions of Law.

unquestionably responsible for the payment of these recourse obligations, as recognized by the defendants' own witnesses. For example, Mr. Kevelson testified as follows:

Q: Is it not true that your clients are personally and severally liable for recourse obligations of their respective partnerships up to three times above and beyond their initial capital contribution?

A: I have drawn the conclusion that, at the points in time in 1978 through the beginning of 1983, they were legally obligated and this supported their ability to deduct certain write-offs.

Q: Isn't it true, Mr. Kevelson, that that is what you have represented to the United States Tax Court in a number of cases in which your clients were involved?

A: What I represented to the Tax Court, what I represented to the Internal Revenue Service, was that during the periods in question before that court through January 3rd, or 2nd, 1983, or whatever date the individual may have sold out, that they were so liable to one entity or another.

. . . . .

In 1983, the representation was that they were discharged from such liability and you will see in countless 906 closing agreements there is a reference to deal with that legal event and how we would handle that for tax purposes.

117. Given the foregoing, the court finds that each defendant received a return of capital in the form of Additional Capital Contribution liabilities allegedly assumed by TSG Partners. That amount (even when coupled with the Initial Capital Contributions returned) is less than the shortfall in assets. Therefore, a judgment against each defendant should also include the Additional Capital Contribution returned, plus interest.[32]

118. This Court also finds that Defendants failed to prove that the interest penalty and additional taxes paid to the IRS are injuries personally sustained as a result of conduct violative of the Federal RICO statute.

119. On February 8, 1988 the Defendant served a Third Party Complaint seeking indemnity against Kenneth T. Kaltman, Steven R. Hageman, Robert D. Gubitosi, Ernest M. Grunebaum, Vito D. Graziano, Joseph J. Riley, Richard A. Gonzales and Stanley v. Cheslock ("Group 1 Third Party Defendants") and seeking contribution against Limited Partners and former Limited Partners of TSG80 who allegedly disposed of their limited partnership interests in TSG80 prior to the institution of this proceeding ("Group 2, 3 and 4 Third Party Defendants").

120. The Third Party Plaintiff's First Claim for Relief sought a judgment against Group 1 Third Party Defendants in the event the Plaintiff recovered a judgment against the Defendant and Third Party Plaintiff.

121. The Court finds that the Third Party Plaintiff has failed to introduce sufficient evidence to meet its burden of proof on its claim for indemnification.

122. The Third Party Plaintiff in its Second Claim for Relief sought a judgment fixing the pro rata liability of each of the Group 2 Third Party Defendants to make Additional Capital Contributions to TSG80 to satisfy Recourse Obligations of TSG80 and for contribution from each of the Group 2 Third Party Defendants if the Plaintiff recovers judgment against the Defendant and Third Party Plaintiff in an amount in excess of the Defendant and Third Party Plaintiff's pro rata obligation among all of the Group 2 Third Party Defendants to make Additional Capital Contributions to TSG80 to satisfy Recourse Obligations of TSG80.

---

**32.** The Appendix attached to this Opinion sets forth: (a) each *defendant's* Additional Capital Contribution liability; and (b) the total of the Initial Capital Contribution *and* Additional Capital Contribution returned to each defendant, with interest due on that total from December 18, 1987 through January 28, 1991.

123. The Court finds that the Third Party Plaintiff has failed to satisfy its burden of proof as to its second claim particularly in light of the court's ruling as to the several liability of each defendant.

124. The Third Party Plaintiff in its Third Claim for Relief sought a judgment fixing the liability of each of the Group 3 and Group 4 Third Party Defendants to make Additional Capital Contributions to TMG and TSG and for contribution from each of the Group 3 and Group 4 Third Party Defendants in the event that the Plaintiff recovers judgment against the Defendant and Third Party Plaintiff in excess of such amount as represents the Defendant and Third Party Plaintiff's liability to make Additional Capital Contributions to TSG80 to satisfy Recourse Obligations of the Partnership which Recourse Obligations arise out of the status of TSG80 as a partner of TSGS with the amount of the liability of the Group 3 and 4 Third Party Defendants being calculated as provided in cases of joint liability and with each of the Group 3 and 4 Third Party Defendants being liable for his pro rata share of the entire portion of the joint liability of the partnership in which he or she is or was a Limited Partner and to otherwise balance the equities between the parties.

125. The Court finds that the Third Party Plaintiff has failed to brief or support Count III through evidence presented at trial. The settlements previously approved by this Court dismissed the settling Limited Partners from this litigation. The settling Limited Partners have been dismissed and released by virtue of their Settlements and as previously found by this Court there is no liability on the Third Party Claims asserted against them.

126. The Third Party Plaintiff in its Fourth Claim for Relief sought a judgment liquidating the amount of the liability of TMG, TSG and Ameribond their joint liability with TSG80 for the debts of TSGS and for a judgment of contribution against Ameribond in the event that the Plaintiff re-covers judgment against the Defendant and Third Party Plaintiff in excess of such amount as represents the Defendant and Third Party Plaintiff's liability to make Additional Capital Contributions to TSG80 to satisfy Recourse Obligations of TSG80, which Recourse Obligations arise out of the status of TSG80 as a partner of TSGS with such judgment of contribution being in such amount as represents the amount of any judgment against the Defendant and Third Party Plaintiff in excess of the amount which would be the Defendant and Third Party Plaintiff's pro rata share of Recourse Obligations of TSG80 rising out of its status as a partner of TSG had Ameribond paid its share of the joint liability of TSG80, TMG, TSG and Ameribond for the debts of TSGS and otherwise balancing the equities between the parties.

127. The Court finds that the Third Party Plaintiff has failed to brief or support Count IV of the Third Party Complaint at trial and has essentially abandoned same. The Court has no evidence by which it could effectively enter a judgment fixing the liability of TMG, TSG, TSG80 or Ameribond. The Third Party Plaintiff has failed to meet its burden of proof.

Based on the preceding Findings of Fact, coupled with those points discussed in the Conclusions of Law, the court finds that a Final Judgment should be entered against *each* defendant in an amount equal to the lesser of the shortfall in assets or the total contributions returned plus interest.[33]

## CONCLUSIONS OF LAW

■ 1. The Post–Confirmation Administrator retains his rights and duties as the former Chapter 11 Trustee for these estates. In this regard, "[t]he trustee represents not only the rights of the debtor but also the interests of creditors of the debtor." *Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339, 1342 (7th Cir.1987). Accordingly, a trustee "may bring suit to reach property or choses in action belonging to the estate that

---

**33.** Count II in the Complaints and the defendants's affirmative defenses and Counterclaims are discussed in the Conclusions of Law.

will then be distributed to all creditors. The trustee's single effort eliminates the many wasteful and competitive suits of individual creditors." *Id.* at 1342–43.

■ 2. "Whether the trustee is representing the estate or 'standing in the shoes' of the creditors, he has the obligation to marshall the debtor's property for the benefit of the estate, and thus the right to sue parties for the recovery of all property available under state law. He then distributes the amounts collected on a pro rata basis to all creditors in accordance with the bankruptcy provisions...." *Id.* at 1343.

3. The Post–Confirmation Administrator's institution and prosecution of these consolidated adversary proceedings is part of the fulfillment of his obligation to marshall assets and property for the benefit of these estates. He has met his burden of proof of fulfilling this obligation and a judgment should be entered against the defendants accordingly.

### COUNT I

4. Based upon its earlier rulings, this court has stated that the defendants' liability under Count I is an accomplished fact. Thus, only damages remain to be decided.

5. The determination of damages is based upon obligations of the Limited Partnerships outstanding as of the date that the defendants withdrew as limited partners. The defendants contend that this withdrawal was effected as of January 3, 1983 and the court concludes that this is the date of withdrawal.

6. The court has found that the unpaid portions of obligations incurred before January 3, 1983 now total approximately $17.5 million (exclusive of post-petition interest).[34] The only specific claims which require additional discussion are the lease claims.

The Lease Claims

7. The Equitable and the 767 Third Avenue Associates claims are based upon long-term leases entered into prior to January 1983 (before the defendants' withdrawal as limited partners). Accordingly, the court has concluded that the debt owed on these leases constitutes damages for which the defendants are responsible.

8. In drawing this conclusion, the court has not overlooked the decisions in *59th and Park Assoc. v. Inselbuch,* 68 A.D.2d 838, 414 N.Y.S.2d 537 (Sup.Ct. 1st Dept. 1979) and *Barbro Realty Co. v. Newburger,* 53 A.D.2d 34, 385 N.Y.S.2d 68 (Sup.Ct. 1st Dept.1976). In these cases, the courts discussed whether partners were personally responsible for damages resulting from the partnerships' breach of leases.

9. In *Barbro Realty,* a general partnership tenant had entered into a long-term lease in 1964 and 1965. From 1966 to 1970, five new individuals became partners and in 1974, the partnership defaulted on its lease payments. 385 N.Y.S.2d at 69.

10. The landlord brought suit against the five new partners, seeking to hold them personally liable. The partners defended on the basis of Section 28 of the New York Partnership Law, which excludes an incoming partner from personal liability for pre-existing partnership debts. The court rejected this defense, finding that the leases were not pre-existing debts because "the rent as a debt arose only when it became due and accordingly, the defendants, who were partners at the time of the default, may be personally liable therefor." 385 N.Y.S.2d at 70.

11. In *59th and Park Assoc.,* a general partnership tenant had executed a long-term lease in 1969. In 1972 and 1973, two of the general partners withdrew from the partnership, which later entered into a surrender agreement with the landlord. Under that agreement, the partnership

---

34. Some of these claims have been adjudicated or otherwise ruled upon by the court either before or during the serial trial of these consolidated adversary proceedings. This process corresponds to the format suggested by the defendants and establishes the "law of the case." *See Arizona v. California,* 460 U.S. 605, 618–19, 103 S.Ct. 1382, 1391–92, 75 L.Ed.2d 318 (1983) (where the Court discussed this principle and further noted that "a fundamental precept of common-law adjudication is that an issue once determined by a competent court is conclusive.")

stopped lease payments and surrendered the premises to the landlord, who retained the right to pursue amounts owed on the lease against past and former partners. 414 N.Y.S.2d at 537–38.

12. The landlord brought suit against numerous defendants, including the two general partners who had withdrawn before the default. As to these two defendants, the court (relying upon the holding in *Barbro Realty*) found that they "had withdrawn from the partnership before the time stipulated for payment; hence, there was no debt at [the] time of withdrawal." 414 N.Y.S.2d at 538.

13. The opinions in *Barbro Realty* and *59th and Park Assoc.* are inapplicable to and distinguishable from the present case on two grounds. First, those cases dealt with the liability of general partners—they did not take into account the public policy behind Section 106(4) of the New York Limited Partnership law; i.e., the protection of creditors. *See Whitley v. Klauber,* 51 N.Y.2d 555, 563, 435 N.Y.S.2d 568, 416 N.E.2d 569 (1980). Second, the limited partners in the these adversary proceedings made public commitments (made legally binding on them by statute) to be responsible for the obligations of their partnerships and in conjunction with their withdrawal, they were specifically warned in writing that "existing creditors ... may have the right to make a direct claim [against you] for up to the amount of [your] Additional Capital Commitment if [TSG, TSG80 and TMG] do not pay such creditors." After this warning, the defendants were then reminded of the material terms of The Equitable and 767 Third Avenue Associates leases.

14. The general principles of partnership law articulated in *Barbro Realty* and *59th and Park Assoc.* cannot overcome the contractual and statutory obligations of these defendants. Based upon these circumstances, the damages under Count I include The Equitable and the 767 Third Avenue Associates lease obligations.

The Nature and Extent of the Defendants' Liability

15. There is a significant shortfall in partnership assets to satisfy the Limited Partnerships' unpaid obligations to their creditors. The defendants are severally liable for that shortfall to the extent that they received a return of capital, plus interest.

16. This court's finding of liability was based upon Section 106(4) of the New York Act and the decision in *Whitley v. Klauber.* The court in *Whitley* cited with approval the opinion in *Kittredge v. Langley,* 252 N.Y. 405, 169 N.E. 626 (1930), wherein Justice Benjamin Cardozo stated that under New York partnership law, a limited partner's "contribution, *like the capital of a corporation and to a similar extent, is to be treated as a trust fund* for the discharge of liabilities.... He can gain *nothing* for himself out of the fund so created, *except in subordination to the creditors,* until the debts have been extinguished." 252 N.Y. at 419, 169 N.E. at 631 (emphasis supplied), quoted in *Whitley,* 51 N.Y.2d at 564, 435 N.Y.S.2d 568, 416 N.E.2d 569.

17. The "trust fund" doctrine referred to in *Kittredge* was discussed by the United States Supreme Court in *Phillips–Jones Corp. v. Parmley,* 302 U.S. 233, 58 S.Ct. 197, 82 L.Ed. 221 (1937), where the Court noted that under this doctrine, "if the assets of a corporation are distributed among the stockholders before all of its debts are paid, each stockholder is liable *severally* to creditors...." *Id.* at 236, 58 S.Ct. at 198 (emphasis added). In *Parmley,* a corporation was dissolved and its assets were ratably distributed among its 11 shareholders. Several years later, the IRS assessed additional taxes against the company and sought to recover these taxes from the estate of only *one* shareholder (who received a distribution from the corporation in excess of the additional taxes assessed). *Id.* at 234, 58 S.Ct. at 197–98.

18. The shareholder's estate argued that "in no event could [the] estate be held liable for more than his pro rata portion of the unpaid tax of the company." *Id.* That argument was rejected by the Supreme Court, which relied upon the "trust fund" doctrine to find that each shareholder was severally liable and the government "was

free to pursue [one shareholder's estate] for the entire amount of the unpaid taxes." *Id.* at 236, 58 S.Ct. at 198.

19. Just as in *Parmley, each* defendant in these proceedings is *severally* liable for the shortfall in assets (in an amount equal to the capital returned to that defendant, plus interest).[35]

The Return of Capital

■ 20. This court has previously determined that the promissory notes and the cash paid on those notes constitute a return of capital. The court now concludes that the defendants received *another* return of capital in the form of Additional Capital Contribution liabilities allegedly assumed by TSG Partners.

21. Section 93 of the New York Act states in part that "[t]he contributions of a limited partner may be in cash *or other property....*" (emphasis supplied). In this instance, the contributions of each limited partner defendant to the Limited Partnerships consisted of cash *and* "other property" in the form of a promise to make Additional Capital Contributions to the Limited Partnership in response to a call by the general partner.

22. The defendants acknowledge (and some have affirmatively represented to the Tax Court) that until their withdrawal as limited partners, they were fully obligated to make Additional Capital Contributions. They now contend (both here and before the Tax Court) that they were relieved of this obligation when it was assumed by TSG Partners; i.e., their promises to make Additional Capital Contributions were in effect returned to them. Having so asserted, and having offered testimony as to the benefits to them of this transaction, the court determines that each defendant received an additional return of capital in an amount equal to his Additional Capital Contribution liability.

Interest Due on Returned Capital

■ 23. This court has ruled that "the defendants will be directed to turn over a sum not to exceed the amount of capital contributions returned *plus interest.*"

24. Section 5004 of the Civil Practice Law and Rules for New York [McKinney's CPLR Book 7B] provides that "[i]nterest shall be at the rate of nine per centum per annum...." This statutory rate of interest, which became effective as of January 15, 1981,[36] is applicable to "all accruals of interest," *Williamson & Co. v. Colby Engraving*, 98 Misc.2d 134, 413 N.Y.S.2d 580, 581 (Sup.Ct. Queens Co.1979), including pre-judgment interest. *Buffalo Forge Co. v. Ogden Corp.*, 555 F.Supp. 892, 907 (W.D. N.Y.1983), *aff'd.* 717 F.2d 757 (2d Cir.1983).

25. The court concludes that pre-judgment interest at the rate of 9% per annum is due on the amount of capital returned to *each* defendant. This interest should run from December 18, 1987 (the date of the filing of the last adversary complaint).[37]

*Pre–Judgment Interest*

26. The plaintiff is entitled to an award of pre-judgment interest on damages. *See generally* § 5001(a) of the Civil Practice Law and Rules for New York (McKinney's CPLR Book 7B). In this regard, § 5001(b) of the Civil Practice Law and Rules for New York provides as follows:

Date from which computed. Interest shall be computed from the earliest ascertainable date the cause of action existed.... Where such damages were incurred at various times, interest shall be computed upon each item from the date

---

**35.** The defendants cannot be heard to argue against the fairness of this result for two reasons: First, each of them had a right of contribution against the other defendants to determine, *as among themselves*, their pro rata liability. *Parmley*, 302 U.S. at 235–37, 58 S.Ct. at 198–99. *See also Newman v. Lefkowitz*, 60 Misc.2d 104, 301 N.Y.S.2d 738, 741 (Dist.Ct. 1969). Second, despite having the right of contribution, the defendants have chosen not to exercise this right among themselves (at least in this litigation).

**36.** *See* Section 2 of L.1981, c. 258 (NY) and the Historical Note to § 5004 in the 1990 Supp. Pamphlet to McKinney's CPLR Book 7B at p. 520.

**37.** The Appendix to this Opinion sets forth these interest calculations from December 18, 1987 through January 28, 1991.

it was incurred or upon all of the damages from a single reasonable intermediate date.

27. This court has found that the plaintiff's damages are based upon Limited Partnership obligations incurred prior to January 3, 1983. While many of these obligations were incurred well before that time, the court concludes that in view of the total circumstances of this case, December 18, 1987 is a reasonable intermediate date from which to compute pre-judgment interest.[38]

### *Affirmative Defenses Directed to Count I*

28. On August 9, 1988, the court entered an Order striking many of the defenses raised by the defendants. The remaining defenses which relate specifically to Count I are discussed below.

The Failure to State a Claim Upon Which Relief Can be Granted

29. The defendants contend that the plaintiff has failed to state a claim upon which relief can be granted.[39] However, this court has granted the plaintiff's Motion for Partial Summary Judgment as to the defendants' liability under Count I of the Complaints filed in these consolidated actions. In making that ruling, the court clearly determined that the plaintiff stated a claim for relief under Section 106(4) of the New York Act.

Lack of Jurisdiction

■ 30. The defendants raise the defense of lack of subject matter jurisdiction, contending that this matter is not a core proceeding within the meaning of 28 U.S.C. § 157 and consequently, this court may not exercise jurisdiction over this controversy.[40] However, the defendants waived this defense when they did not make a timely Motion for Withdrawal of Reference. *See In re Securities Group 1980*, 89 B.R. 192, 194–95 (M.D.Fla.1988). *See also In re Securities Group 1980*, 89 B.R. 196, 197 (M.D.Fla.1988). Moreover, the defendants waived this defense "when they moved for consolidation with [A]dversary No. 85–214 without simultaneously seeking the withdrawal of the reference." *In re Securities Group 1980*, 89 B.R. 196, 197 (M.D.Fla. 1988). *See also In re Securities Group 1980*, 89 B.R. 189, 190 (M.D.Fla.1988); *In re Securities Group*, 89 B.R. 190, 191–92 (M.D.Fla.1988).[41]

Violation of Article III of the Constitution

31. The defendants argue that the United States Supreme Court decision in *Northern Pipeline Construction Company v. Marathon Pipe Line Company*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) precludes this court from rendering a valid judgment under Article III of the Constitution.[42] This argument presupposes that these consolidated proceedings are non-core

**38.** This conclusion is made without prejudice to the rights of creditors to apply to this court for post-petition interest. Simply stated, the court does not decide the issue of post-petition interest at this time, but it does note that based upon the award of pre-judgment interest, it appears that there will be available funds which may allow for the award of post-petition interest.

**39.** DSA's First Defense in its February 8, 1988 Answer to the Amended Complaint in Adversary No. 85–214; the Young Defendants' First Defense in their February 8, 1988 Answers to the Complaints filed in Adversary Nos. 87–303, 87–304 and 87–305; and the Kantor/Babitt Defendants Fourth Defense in their March 15, 1988 Answers to the Complaints filed in Adversary Nos. 87–303, 87–304 and 87–305. These Answers are the context for future references to the defendants' affirmative defenses.

**40.** DSA's Second Defense and the Kantor/Babitt Defendants' Fifth Defense. The Young Defen-

dants' Second Defense simply asserts that this court lacks subject matter jurisdiction. These Defenses apply to Count II as well.

**41.** While these cases dealt with Adversary Nos. 87–304 and 87–305, the same reasoning is applicable to Adversary No. 87–303, which was also the subject of the defendants' Motion for Consolidation. Even without reference to any procedural considerations, it is clear that these consolidated adversary proceedings are in fact "core proceedings" for purposes of 28 U.S.C. § 157. *See In re Securities Group*, 89 B.R. at 190. *See also In re Auto Dealer Services, Inc.*, 96 B.R. 360, 364 (M.D.Fla.1989); *In re The Lion Capital Group*, 46 B.R. 850, 856 (S.D.N.Y.1985).

**42.** DSA's Third Defense; the Young Defendants' Third Defense; and the Kantor/Babitt Defendants' Seventh Defense. These Defenses apply to Count II as well.

in nature, *see In re Lion Capital Group*, 46 B.R. 850, 852–53 (S.D.N.Y.1985), and as discussed above, this is not the case.

### Lack of In Personam Jurisdiction

32. The Kantor/Babitt Defendants raise a lack of personal jurisdiction defense.[43] These defendants failed to present any evidence to support this defense and the court concludes that they were properly subjected to the jurisdiction of this court. *See, e.g.*, Bankruptcy Rule of Procedure 7004(d).

### The Statute of Limitations

33. The defendants claim that the relief sought in Count I of the Complaints in these consolidated adversary proceedings is barred by the statute of limitations.[44] This argument has been rejected by this court, as evidenced by the granting of the plaintiff's Motion for Partial Summary Judgment as to Count I of the Complaints. In considering that Motion, the court held that "plaintiff's action is not time barred under [New York Civil Practice Law and Rules] 214(2) or *any other* statute of limitations."

### COUNT II

34. This Count is premised upon each defendant's promise that he would be personally and severally liable for the Limited Partnership's recourse debt obligations up to an amount equal to three times his Initial Capital Contribution. Count II alleges that the defendants are liable for these Additional Capital Contributions based upon *either:* (a) the New York Act (i.e., a statutory theory of liability); *or* (b) the Limited Partnership Agreements (i.e., a contractual theory of liability).

35. The statutory theory of liability under Count II is premised upon Section 106(1)(b) of the New York Act, which states that

A limited partner is liable to the partnership [f]or any unpaid contribution which he agreed in the [limited partnership] certificate to make in the future at the time and on the conditions stated in the certificate.

36. Although described in slightly different language, each Limited Partnership Certificate for TMG, TSG and TSG80 states that upon demand, each limited partner shall be personally liable for the Limited Partnership's recourse debt obligations up to an amount equal to three times the limited partner's Initial Capital Contribution.

37. The contractual theory of liability under Count II is premised upon the Limited Partnership Agreements for TMG, TSG and TSG80. These Agreements also provide that each limited partner shall be personally liable for the Limited Partnership's recourse debt obligations up to an amount equal to three times the limited partner's Initial Capital Contribution.

38. Immediately prior to the beginning of the trial of these consolidated adversary proceedings, the plaintiff offered to abandon the contractual theory of liability. However, certain defense counsel objected to this abandonment and as a result, the plaintiff left the contractual theory of liability to be decided by the court.

39. The court concludes that the defendants are liable on both the statutory and contractual theories articulated by the plaintiff in Count II. As to the latter theory, the defendants have previously asserted the defense that the Partnership Agreements were executory contracts which the plaintiff rejected and therefore, the plaintiff has no right to enforce the Additional Capital Contribution liability in the Agreements.[45] However, this defense (and others) were stricken by the court's August 9, 1988 Order.[46] The remaining defenses

---

**43.** The Kantor/Babitt Defendant's Seventeenth Defense. This Defense applies to Count II as well.

**44.** DSA's Fourteenth Defense; the Young Defendants' Fourteenth Defense; and the Kantor/Babitt Defendants' Second Defense.

**45.** DSA's Thirteenth Affirmative Defense and the Young Defendants' Thirteenth Affirmative Defense.

**46.** This court is aware of Judge Black's July 20, 1988 Opinion and Order entered in *Lowin v. Atkins, et al.*, Case Nos. 84–428–BK–J and 87–107–Civ–J in the United States District Court for the Middle District of Florida. By that Opinion and Order, Judge Black found that certain non-

which relate specifically to Count II are discussed below.

### The Failure to State a Claim Upon Which Relief Can be Granted

40. The defendants contend that the plaintiff has failed to state a claim upon which relief can be granted.[47] Section 106(1)(b) of the New York Act is based upon and tracks § 106(1)(b) of the Uniform Partnership Act. Many courts have held that an action may be brought under this latter section to collect contributions due from limited partners. *See, e.g., Neil v. United States*, 195 F.2d 336 (5th Cir.1960); *Partnership Equities, Inc. v. Marten*, 15 Mass.App. 42, 443 N.E.2d 134 (1982); *Bell Sound Studios v. Enneagram Productions*, 36 Misc.2d 879, 234 N.Y.S.2d 12 (Civ. Ct.N.Y.Co.1962). Therefore, Count II states a claim upon which relief can be granted.

### The Assignment to TSG Partners

41. The defendants contend that their Additional Capital Contribution liability was assigned to TSG Partners.[48] However, this purported assignment does not negate liability under Count II. Instead, that assignment pertains only to the relationship between TSG Partners and the defendants—it has no effect upon the rights of creditors to rely upon the defendants' public promise (in the form of recorded Limited Partnership Certificates) to be personally liable in an amount equal to three times their Initial Capital Contribution. Nor does it have any effect on the defendants' contractual obligations prior to their withdrawal as limited partners.

42. In fact, this court has previously ruled that "by virtue of [§ 108(7) ] of the New York [Act] the defendants are not relieved of liability because they assigned their interests to TSG Partners." As set forth in § 108(7) of the New York Act, the

"[s]ubstitution of the assignee as a limited partner does not release the assignor from liability to the partnership...."

### The Assignment to Manufacturers Hanover Bank

43. DSA and the Young Defendants contend that the limited partner defendants' responsibility to make Additional Capital Contributions was assigned to Manufacturers Hanover Bank ("the Bank") prior to Groups incurring debts which are recourse obligations. Thus, these defendants contend that Groups did not have the authority to incur additional recourse obligations within the entire period during which the defendants were limited partners.[49]

44. While the defendants established that the Bank was Groups clearing agent they failed to produce any evidence showing that their responsibility to make Additional Capital Contributions was assigned, pledged or otherwise transferred to the Bank. The only evidence concerning the defendants and the Bank was an *unexecuted draft* "confirmation" which simply references a *proposal* whereby: (a) TSG, TMG and TSG80 would be obligated to the Bank and; (b) each limited partner would be responsible for the payment of this recourse obligation to the extent of his responsibility to make Additional Capital Contributions. At best, this simply reiterates the obvious: Groups and its constituent partnerships would incur obligations and the limited partners were responsible for these recourse obligations in an amount equal to three times the Initial Capital Contribution if the obligations were not paid by the partnerships.

### Untimely Call for Additional Capital Contributions

The Kantor/Babitt Defendants argue that the call for Additional Capital Contri-

---

tendered limited partners in TMG were not liable for Additional Capital Contributions because the TMG Partnership Agreement was an executory contract which was not timely assumed by the trustee. This finding was premised in large part upon the fact that the limited partners had *not* withdrawn from TMG (unlike the defendants in the present cases).

**47.** DSA's First Defense; the Young Defendants' First Defense; and the Kantor/Babitt Defendants' First Defense.

**48.** DSA's Fifth Defense; the Young Defendants' Fifth Defense; and the Kantor/Babitt Defendants' Eleventh Defense.

**49.** DSA's Sixth Defense and the Young Defendants' Sixth Defense.

butions did *not occur while they were limit-ed partners.*[50] However, this is not required by the Partnership Agreements.

Pro Rata Limitation of Liability for Additional Capital Contributions

45. DSA and the Young Defendants argue that their liability for Additional Capital Contributions to satisfy recourse obligations should be limited on a pro rata basis with other limited partners of the Limited Partnerships.[51]

46. The Partnership Agreements for TMG, TSG and TSG80 provide that "[e]ach Limited Partner shall be *personally and severally* liable ... for recourse obligations of the Partnership...." As this language plainly indicates, each defendant is "personally and severally liable" for recourse obligations incurred by the Limited Partnerships. Thus, there is no pro rata limitation of liability. Instead, each defendant is fully responsible under Count II to the extent of his Additional Capital Contribution liability for the recourse obligations of the Limited Partnerships.

Joint and Several Limited Partnership Liability for Recourse Obligations

47. DSA states that in addition to TSG80 (which is the real party plaintiff in the *Lowin v. DSA* litigation), other entities are general partners of Groups and these entities are jointly obligated to pay Groups' recourse obligations.[52] However, this argument completely ignores the personal and several liability, as just discussed.

No Recourse Obligations

48. The defendants argue that there are no recourse obligations for which they are liable,[53] contending in part that there was no written agreement given to creditors indicating that the creditors' debts were recourse obligations.

49. The defendants rely upon provisions of the limited partnership agreements which provide that:

In connection with such Recourse Obligations, the general partners *are authorized* to execute and deliver to the Partnership's lenders, agreements pursuant to which the Limited Partners will be personally liable pari passu to such lenders to satisfy any Recourse Obligations of the Partnership which cannot be satisfied out of the assets of the Partnership.

50. Notably, this language does not *require* that the general partners obtain a writing from lenders. Moreover, the Limited Partnership Certificates that were filed as public documents in New York County (and which were the only documents that the creditors were deemed to have constructive notice of) *make no reference to obtaining a written agreement.*

51. Since the creditors had constructive notice of the Limited Partnership Certificates (and had no notice of the terms of the Limited Partnership Agreements), the Certificates must be deemed to control. Thus, no writing was required to create recourse obligations to creditors for which the limited partners are responsible.

52. Additionally, the definition of "recourse obligation" in the Limited Partnership Agreements reads as follows:

8.24 Recourse Obligation. Any obligation(s) as to which the creditor of the capital Partnership *may look to the Limited Partners, severally,* for repayment, *including but not limited to* liabilities which are direct obligations of the Limited Partners incurred on their behalf by the General Partner pursuant to the authority granted under Section 1.06(c) of this Agreement.

53. Section 1.06(c) of the Limited Partnership Agreement states in part that:

Each Limited Partner shall be personally and severally liable for Recourse Obligations.... *In this regard, the General Partner is authorized to incur immediately and thereafter to maintain Recourse Obligations in an amount equal*

---

**50.** The Kantor/Babitt Defendants' Twelfth Defense.

**51.** DSA's Eighth Defense and the Young Defendants' Eighth Defense.

**52.** DSA's Ninth Defense.

**53.** DSA's Eighth Defense; the Young Defendants' Eighth Defense; and the Kantor/Babitt Defendants' Fifteenth Defense.

*to the aggregate liability of all Limited Partners therefor.*

54. Clearly, the term "recourse obligations" must be taken to have its ordinary business and legal meaning; *i.e.,* that creditors have recourse against the partnership and the Additional Capital Contribution liability of the limited partners (unless a debt is specifically designated as "non-recourse").

55. It is noteworthy that Mr. Atkins stated that his definition of the term "recourse obligations" would be "debt obligations of the general partnership for which a lender would have recourse to the partnership." Likewise, Groups' Executive Committee's working definition of "recourse obligation" was any debt "that was incurred by the partnership for which the partnership could be liable."

56. The court concludes that the term "recourse obligations" must be given its ordinary business meaning and that the obligations described in the Findings of Facts are "recourse obligations" within the meaning of the Limited Partnership Agreements and the Limited Partnership Certificates.

The Recourse Obligations Were Incurred in Connection with Unauthorized Activities

■ 57. The defendants assert that Groups and its constituent partners were not authorized to engage in the activities which gave rise, either in whole or in part, to recourse obligations.[54] This argument was generally addressed and rejected by the court in its January 3, 1989 Memorandum Opinion filed in support of the Order Overruling Objection to Claims of Morgan Guaranty Trust Company of New York ("Morgan Bank"). In that Opinion, the court noted that New York case law is abundantly clear that the actions of one partner need not be actually within the scope of the partnership's business to be binding on the other partners, so long as it is apparently within the scope of the partnership's business. *See also In re The*

*Securities Group,* 89 B.R. 204, 215 (N.D. Fla.1988); *See also Bank of Commerce v. DeSantis,* 114 Misc.2d 491, 451 N.Y.S.2d 974 (N.Y.City Cir.Ct.1982).

■ 58. Furthermore, this court has noted that the Limited Partnership agreements "authorized the partnerships to 'engage in any and all business activities as may be permitted by law including but not limited to ... investment related activities.'" The court concludes that the claims of creditors which give rise to the damages sought by the Post–Confirmation Administrator clearly constitute both "any and all business activities as may be permitted by law" *and* "investment related activities."

59. The obligations incurred by Groups were within the scope of its business. For example, Groups had to lease and furnish office space in order to conduct its business (respectively, these matters are the subject of The Equitable obligation and the James Steward Polshek obligation).

60. This court has found that Groups' guaranty of the Morgan Bank obligations was clearly within the scope of Groups' business purposes. Likewise, the court concludes that Groups' guaranty of the Chemical Bank obligation and the 767 Third Avenue obligation were also within the scope of Groups' business purposes, particularly because Groups was interested in the success of the debtor. *See generally, Hess v. W. & J. Sloane,* 66 A.D. 522, 73 N.Y.S. 313 (1st Dep't 1901), *aff'd,* 173 N.Y. 616, 66 N.E. 1110 (1903) (a seller was liable on its guaranty of a customer's debt because the guarantor had some interest, albeit indirect, in the success of its customer). *See also Brockport National Bank v. Webaco Oil Co.,* 257 A.D. 68, 12 N.Y.S.2d 652 (4th Dep't 1939); *Trimline Window Frame, Inc. v. Rural New Yorker, Inc.,* 8 Misc.2d 645, 168 N.Y.S.2d 170, 172 (Sup.Ct. Naussau Co.1957).

61. Groups' obligation to SoCal clearly stemmed from an investment-related activity, as did the Chase Bank obligation (which

---

**54.** DSA's Eleventh Defense; the Young Defendants' Tenth Defense; and the Kantor/Babitt Defendants' Sixteenth Defense. DSA's Eleventh Defense and the Young Defendants' Tenth Defense also point out that many of the claims which form the basis of recourse obligations are the subject of pending objections. This court rejected this defense at trial.

was directly related to the trading of government securities) and the Leonard Levie obligation (which was directly related to the partnerships' employment of a government trader). Similarly, the Cralin Asset Management obligation was based upon a December 1982 margin deposit placed with Groups and was likewise related to Groups' business activities.

Financial Accommodation

■ 62. The defendants allege that the plaintiff is attempting to affirm and enforce an agreement for financial accommodation in contravention of 11 U.S.C. Sec. 365(c)(2).[55] In part, this statute provides that a trustee may not assume any executory contract if such a contract is one "to make a loan, or extend other debt financing or financial accommodations to or for the benefit of the debtor...."

63. The applicability of this statute is dependent upon a finding that the Limited Partnership Agreements are executory. As clearly indicated by the court's striking of the defendants' executory contract defense,[56] such is not the case.

64. Moreover, the legislative history for this statute notes that the purpose of this section "is to make clear that a party to a transaction which is based upon the financial strength of the debtor should not be required to extend new credit to the debtor in the form of loans, lease financing or the purchase of discount notes." S.Rep. No. 95–989, 95th Cong.2nd Sess. (1978) 58–59, 5 U.S.Code & Administrative News (1978) 5787, pp. 5844–45.

65. In this instance, the Post–Confirmation Administrator's call for Additional Capital Contributions is not the equivalent of requiring the limited partner defendants to extend new credit to the debtors in the form of loans, lease financing or the purchase of discount notes. In contrast, the money which was pledged by these defendants to the Limited Partnerships was made as an equity investment without any expectation that the Partnerships would repay the limited partners at a future date.

■ 66. Lastly, the court notes that the financial accommodation defense is only applicable to a contract-based claim. In this instance, there is a separate statutory-based claim in Count II which is unaffected by the financial accommodation defense.

## OTHER AFFIRMATIVE DEFENSES AND THE DEFENDANTS' COUNTERCLAIMS

67. The defendants have raised other affirmative defenses and related Counterclaims (which are treated as set-off defenses in view of this court's earlier finding that the defendants can assert their Counterclaims *only* as a potential set-off against the plaintiff's damages). *See* the August 5, 1988 Order on Plaintiff's Motion to Dismiss the Counterclaims of "Carlton, Fields" and "Kantor" Defendants.

68. The defendants' set-off defenses and Counterclaims are briefly discussed below, followed by an analysis of why they must be subordinated to (and not set-off against) the damages which the Post–Confirmation Administrator claims for and on behalf of the creditors of these estates.

Violations of Rule 10b–5

■ 69. DSA and the Young Defendants allege that the Limited Partnerships engaged in the dissemination of false and misleading information in connection with the offering of limited partnership units, thereby violating Rule 10b–5 of the Securities Exchange Commission.[57] These defendants allege that accordingly, they are entitled to rescind their purchase of the limited partnership units.

70. As noted in *Freschi v. Grand Coal Venture,* 767 F.2d 1041, 1047 (2d Cir.

---

**55.** DSA's Tenth Defense; the Young Defendants' Ninth Defense; and the Kantor/Babitt Defendants' Third Defense.

**56.** See footnote 12 *supra* and accompanying text.

**57.** DSA's Seventeenth Defense and Second Counterclaim; and the Young Defendants' Counts I and II in their Counterclaim.

1985),[58] "a 10b–5 violation has two essential elements: the use of the mail, an instrumentality of Interstate Commerce, or a Securities Exchange Facility; and a fraudulent scheme or untrue or misleading statement." *Id.* at 1047. In order to establish a 10b–5 claim, a plaintiff is required to prove these elements and show that "the deceptive conduct must have occurred in connection with the purchase or sale of the security, and that the defendant or defendants' must have acted with scienter." *Id.* at 1048.

71. While this record speaks for itself concerning facts that are relevant to the preceding elements which the defendants must establish, the court does note that the so-called deceptive conduct and fraudulent acts or omissions committed by the general partners of the Limited Partnerships do not appear to have occurred in connection with the actual sale of the limited partnership interests to the defendants. In any event, the court concludes that the defendants have failed to establish their entitlement to damages under Rule 10b–5.

72. In *Freschi*, the plaintiff successfully asserted a Rule 10b–5 claim against the defendants, based upon their fraud and deception in connection with the plaintiff's investment in a tax shelter. 767 F.2d at 1043–45. In conjunction with that investment, the plaintiff had claimed significant tax deductions. Ultimately, however, the IRS disallowed these deductions and assessed a penalty against the plaintiff. *Id.* at 1045.

73. After successfully establishing that the defendants violated Rule 10b–5, the plaintiff in *Freschi* argued that he was entitled to damages "as a result of any adverse tax consequences which he would have avoided if the Grand Coal Venture had been a legitimate tax shelter." *Id.* at

1051. The trial court rejected this damage claim.

74. On appeal, the court noted that recoverable damages under 10b–5 are limited to "actual net economic loss." *Freschi,* 767 F.2d at 1051. *Cf. Pelletier v. Stuart-James Co., Inc.,* 863 F.2d 1550, 1557 (11th Cir.1989) ("In securities fraud cases, therefore, damages are determined in accordance with the extent to which a plaintiff is actually damaged as a result of the defendant's fraudulent conduct.... 'Actual damages' has been interpreted to mean some economic loss....).

75. Based upon the "economic loss rule," the court in *Freschi* held that "a Rule 10b–5 plaintiff can be compensated only for actual damages ... and any award and compensation for hoped-for tax savings would be an impermissible award of damages arising from an expectation interest." 767 F.2d at 1051. Consequently, the appellate court rejected the plaintiff's argument that "his damages should be increased to compensate [him] for tax savings [he] would have realized had the full deductions been allowed." *Id.*

76. The *Freschi* court ruled that
[t]he district court correctly held that a Rule 10b–5 plaintiff can be compensated only for actual damages, and that any award and compensation for hoped-for tax savings would be an impermissible award of damages arising from an expectation interest. Similarly, the court noted that the interest in penalties IRS assessed ... were not a consequential damage; rather, they were simply compensation to IRS for the use of money IRS would have had if [the investor] had not wrongly withheld it. The interest and penalties were not, the trial court correctly observed, really a damage suffered by [the investor] at all, but a re-

---

**58.** Vacated on other grounds, 478 U.S. 1015, 106 S.Ct. 3325, 92 L.Ed.2d 731 (1986). The Supreme Court instructed the Second Circuit to reconsider *Freschi* in light of *Randall v. Loftsgaarden,* 478 U.S. 647, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986), where the Court concluded that a securities fraud plaintiff's damages should not be reduced by any tax benefit the investor has received from his investment. 106 S.Ct. at 3149,

3151–52. The *Freschi* court had decided that such a reduction could be taken but on remand, the court modified its decision to hold that the plaintiff's damages would not be reduced "by the amount of the tax benefits resulting from [his] investment." 800 F.2d 305, 306 (2nd Cir. 1986). No other aspect of the *Freschi* court's original decision was affected.

turn by him of what would otherwise be a windfall resulting from his opportunity to use money to which he was not entitled.

767 F.2d at 1051.

77. In the present cases, the limited partner defendants, just as the plaintiff in *Freschi*, claim damages resulting from IRS penalties and interest assessed against them. However, based upon the decision in *Freschi*, this court concludes that these matters are not recoverable damages in a Rule 10b-5 action.[59]

Securities Act Violations

78. The Kantor/Babitt Defendants' claim violation of various provisions of the Securities Act of 1933 and the Securities and Exchange Act of 1934, based upon misrepresentations and omissions in TSG Partners' tender offer and the Limited Partnerships' alleged participation in these matters.[60]

79. The court notes that there was an absence of evidence to support these allegations. Moreover, the Kantor/Babitt defendants failed to establish any damages whatsoever resulting from the conduct in question. The only evidence presented by these defendants concerned their alleged tax losses and that evidence was totally insufficient.

■ 80. Just as the case with the Rule 10b-5 damages discussed above, damages in securities fraud cases in general are limited to actual damages; *i.e.,* the actual economic loss suffered. *See Pelletier*, 863 F.2d at 1557. Accordingly, the interest, penalties and additional taxes allegedly paid by the Kantor/Babitt defendants cannot be recovered as a matter of law.

RICO

■ 81. The defendants allege violations of 18 U.S.C. Sec. 1962(a) based upon alleged acts and omissions referred to above.[61] The record speaks for itself concerning the facts that are relevant to the defendants' RICO claim. The court does note, however, that the RICO off-set sought by the defendants is again based upon interest, penalties and additional taxes paid to the IRS. Since these damages would not be allowed under a securities fraud claim, they should not be allowed under the RICO claim (which is based upon the same essential facts as the securities fraud claim). They are not injuries personally sustained as a result of conduct, if any, violative of the Federal RICO Statute.

82. Another critical point is that the RICO claim is based upon and arises out of the purchase and sale of limited partnership interests in TSG, TMG and TSG80. Therefore, this claim, as well as the other set-off defenses and Counterclaims raised by the defendants, must be subordinated to the plaintiff's damages.

SUBORDINATION

■ 83. Even if this court determined that the defendants were entitled to damages, those damages would have to be subordinated to (and not set off against) the damages awarded to the plaintiff, who essentially stands in the shoes of creditors. *See generally Koch Refining*, 831 F.2d at 1342 ("[t]he trustee represents not only the rights of the debtor but also the interest of creditors of the debtor.") *Cf. Hanover Insurance Co. v. Tyco Industries, Inc.,* 500 F.2d 654, 657 (3d Cir.1974) ("[the trustee] was authorized, exclusively, to bring actions that could have been instituted by the bankrupt for the aggregation of assets and for the protection of creditors.")

**59.** The court also notes that in view of the sale of their limited partnership interests, the defendants are not entitled to rescission, since they cannot return that which they no longer own. *See generally Carlson v. Shepard Pontiac, Inc.,* 63 Misc.2d 994, 314 N.Y.S.2d 77, 80 (Sup.Ct. Fulton Co.1970) ("the purpose of rescission is to restore the parties to the contract to the status, as nearly as possible, existing at the time immediately prior to the making of the contract.")

**60.** The Kantor/Babitt Defendants' Second Counterclaim.

**61.** DSA's Nineteenth Defense and Fourth Counterclaim; the Young Defendants' Count III in their Counterclaim; and the Kantor/Babitt Defendants' Third Counterclaim.

84. Section 510(b) of the Bankruptcy Code plainly and unequivocally *mandates* that "[f]or the purpose of distribution under this title, a claim [for rescission or] ... for damages arising from the purchase or sale of ... a security [of the debtor] ... *shall be subordinated* to all claims or interests that are senior to or equal the claim or interest represented by such security...." 11 U.S.C. § 510(b) (emphasis supplied).

85. A limited partnership interest is a security, *see* 11 U.S.C. § 101(43)(A)(xiii), and therefore, the defendants' claims (which arise from the purchase or sale of their limited partnership interests) cannot be used to reduce the plaintiff's recovery, which is made for the benefit of creditors. Under Section 510(b), the defendants' claims must be subordinated to (not set off against) the plaintiff's damages.

86. In *In the Matter of Baldwin–United Corp.*, 52 B.R. 539 (S.D.Ohio 1985), the plaintiff debtor instituted a Chapter 11 adversary proceeding against the defendant stockholders, seeking to subordinate their securities rescission and loss claims pursuant to § 510(b). (The defendants had filed a federal lawsuit seeking damages for violations of the federal securities law in connection with the sales of Baldwin securities). *Id.* at 540.

87. The court in *Baldwin–United Corp.* stated that "Section 510(b) requires automatic subordination of rescission and damage claims by purchasers of securities to all claims or interests that are *senior or equal....*" 52 B.R. at 540 (emphasis in original). Under this Section, *"stockholder rescission claims may be subordinated to claims of general creditors...." Id.* (emphasis supplied). By extension, the court ruled that "[t]he defendants' securities fraud claims will be subordinated for pur-

poses of distribution below the present holders of each [stock] issue." 52 B.R. at 541.

88. A case even more closely aligned with the present situation is *In re Amarex*, 53 B.R. 888 (W.D.Okl.1985), where pursuant to Section 510(b), the proponent of a plan of reorganization for the debtor partnership sought to subordinate certain claims of limited partners. Those claims were the subject of a class action lawsuit filed on behalf of all limited partners.

89. The limited partner class action lawsuit alleged "violations of sections 5, 12(1)–(2), 15 and 17(a) of the Securities Act of 1933, 15 U.S.C. §§ 77e, 77*l* (1)–(2), 77o, 77q(a) (1981); section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1981); and Rule 10b–5 of the Rules of the Securities Exchange Commission.... Included also [were] allegations of common law fraud, claims on contractual rights and breach of fiduciary duty." 53 B.R. at 889.[62]

90. In *Amarex*,
[c]ounsel for the class action plaintiffs [also] represented that certain of their claims stemmed from [the] failure of Amarex, as general partner of the limited partnerships, to make capital contributions, for failure to make a contractual interest payments, for the commingling of funds, use of those funds for non-partnership purposes and other breaches of fiduciary and contractual obligations.
*Id.*[63]

91. The court in *Amarex* noted that [t]he issue for consideration is thus whether the bankruptcy claims of the class action plaintiffs are excepted from the subordination requirement. They contend this should be the case for, in addition to rescission and damages for

---

**62.** Similarly, the Kantor/Babitt Defendants have alleged violations of: Sections 12(2), 15 and 17(a) of the Securities Act of 1933; and Section 10(b) of the Securities Exchange Act of 1934. *See* the Kantor/Babitt Defendants Second Counterclaim. Likewise, DSA and the Young Defendants have alleged violations of Rule 10(b)(5). *See* DSA's Seventeenth Defense and Second Counterclaim, and the Young Defendants' Counts I and II in their Counterclaim.

**63.** The defendants in the instant consolidated adversary proceedings have also alleged that the general partners used funds for non-partnership purposes and breached fiduciary and contractual obligations. *See* DSA's Eleventh Defense, Eighteenth Defense and Third Counterclaim; the Young Defendants' Tenth Defense and Count IV of their Counterclaim; and the Kantor/Babitt Defendants' Sixteenth Defense.

violation of securities laws, their complaint also seeks damages for breach of contract and common law fraud. The argument is that inclusion of these other allegations in the complaint works to prevent subordination of the same claims in the bankruptcy case. Put in other words the issue is whether the contract and fraud claims seek "damages arising from the purchasor's sale of such a security . . . ." 11 U.S.C. § 510(b). 53 B.R. at 889–90.

92. In deciding this issue, the court first noted that "Congress made subordination of securities laws claims mandatory with the passage of 11 U.S.C. § 510(b). Subordination under § 510(b) is automatic and not discretionary." 53 B.R. at 890.

93. The *Amarex* decision provides a highly appropriate explanation for mandatory subordination under Section 510(b), noting that " 'there are two entirely distinct types of risks taken by creditors and investors when they decide to do business with a corporation: the risk of insolvency of the debtor and the risk of unlawful issuance of securities. It is appropriate that both the general creditors and the investors assume the risk of insolvency. As between the creditors and the investors, however, only the investors should be forced to bear the risk of illegality of the issuance of stock.' " 53 B.R. at 890, quoting *Jezarian v. Raichle (Matter of Stirling Homex Corp.)*, 579 F.2d 206, 214 (2d Cir. 1978), *cert. den.*, 439 U.S. 1074, 99 S.Ct. 847, 59 L.Ed.2d 40 (1979).

94. The *Amarex* court noted that the passage of Section 510(b) "was an express act by Congress to provide that claims of defrauded shareholders [or limited partners] be classified below those of general unsecured creditors." 53 B.R. at 890. Accordingly, since shareholders (or limited partners) bargain for equity-type rewards in exchange for equity-type risks, while general creditors do not, "[t]he equity interest holders, not the general creditors, should bear the risk of illegality in securities offerings." 53 B.R. at 890.

95. The decision in *Amarex* is unquestionably applicable to the damage claims asserted by the limited partner defendants in these adversary proceedings. The mandatory subordination of those claims is further evidenced by Section 112(1) of the New York Limited Partnership Law, which provides that "[i]n settling accounts after dissolution, the liabilities of the partnership shall be entitled to payment in the following order: (a) Those [liabilities] to creditors, in the order of priority as provided by law, *except* those [liabilities] to limited partners on account of their contributions . . . ; (b) those [liabilities] to limited partners in respect to their share of the profits . . . ; [and] (c) those [liabilities] to limited partners in respect to the capital of their contributions." Thus, just as Section 510(b) contemplates that the claims of equity interest holders are subordinate to the claims of general creditors, New York law contemplates that limited partners may not receive a return of their capital unless and until partnership creditors have been paid first. *Cf. Whitley*, 51 N.Y.2d at 564, 435 N.Y. S.2d 568, 416 N.E.2d 569 (a limited partner is not entitled to a return of his contribution "except in subordination to the [partnership's] creditors [and] until the debts have been extinguished.")

96. The mandatory subordination of the defendants' securities' based claims cannot be escaped by an argument that these claims do not arise from damages relating to the purchase or sale of a limited partnership interest. This argument was rejected by the court *Amarex*, which noted that

[t]hese [limited partner] plaintiffs would have no claims against the debtor but for their purchase of the securities, and had the purchase not occurred they would not have the pendant common law claims.

.        .        .        .        .

If the holders [of limited partnership interests] possess their claims because they assumed a risk in seeking a profit, those claims are subordinate to claims of persons who sought simple payment of credit extended to the debtor. The fact that the class action plaintiffs, in addition to rescission, claim damages for fraud and breach of contract does not alter the

circumstance that all their claims arise from the purchase of the securities [i.e., the limited partnership interests].

53 B.R. at 891.

97. Just as the limited partner plaintiffs in *Amarex*, the limited partner defendants in these adversary proceedings would have no claims whatsoever against TSG, TSG80 or TMG but for their purchase of limited partnership interests, and had those purchases not occurred they would not have RICO or common law claims either. Here, just as in *Amarex*, the limited partners possess all of their claims because they assumed a risk in seeking a profit and therefore, their claims must be subordinate to the Post–Confirmation Administrator's damages, by which he seeks a recovery to pay the claims of persons who extended credit and who are entitled to payment.[64]

98. In addition to the subordination which is *required* by the Bankruptcy Code, the court also notes that subordination would be allowed under Section 510(c)(1), which provides that the court may "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of allowed interest to all or part of an another allowed interest...." Equitable subordination under this Section of the Bankruptcy Code is proper where three elements are established:

(1) that the claimant has engaged in inequitable conduct;

(2) that the conduct has injured creditors or given unfair advantage to the claimants; and

(3) the subordination of the claims is not inconsistent with the Bankruptcy Code.

*In re N & D Properties*, 799 F.2d 726, 731 (11th Cir.1986).

99. Clearly, the third element is not an issue; *i.e.*, the subordination of the offset

damages claimed by the defendants is clearly contemplated and in fact mandated by Section 510(b) of the Bankruptcy Code.

100. As to the first two elements for equitable subordination, the court concludes that the defendants have engaged in inequitable conduct insofar as they seek to avoid the consequences of their actions. Simply stated, as part of an intentional investment in what was a known tax shelter, the defendants invested significant sums of money and agreed to be responsible for three times the amount of their investments to pay the creditors of the Limited Partnerships. When the tax laws and circumstances changed to prevent these defendants from recognizing a substantial tax advantage, they withdrew from the Limited Partnerships and now attempt to renege upon their public commitments to be responsible for the recourse obligations of those Partnerships. This conduct is certainly inequitable and it has injured creditors, while providing the defendants with an unfair advantage.

101. Based on the foregoing, the court concludes that under the doctrine of equitable subordination, the defendants are not entitled to set-off their purported damages against the money which owed to and sought on behalf of the creditors of TSG, TMG and TSG80.

102. For the reasons set forth in the Findings of Fact, the court concludes that the Third Party Plaintiff is not entitled to a judgment on its Third Party Complaint. Additionally, the Court notes that by an Order dated April 8, 1988, it ruled that certain Third Party Defendants had entered into and consummated settlement agreements with Louis Lowin (in his former capacity as Chapter 11 Trustee for the bankrupt estates) and since these releases have been approved by the Court, they bar any action by the Defendant and Third

---

**64.** Even if Section 510(b) did not apply (which is not the case), the court would find that the Kantor/Babitt Defendants completely failed to establish any damages arising from the alleged wrongful conduct of the Limited Partnerships. As for DSA and the Young Defendants, the court

notes that based upon the July 16, 1990 Stipulation filed with the court (designated Defendants' Exhibit 141), these defendants claim a tax set-off in the amounts so specified. However, those amounts are still significantly less than the damages assessed against each individual defendant.

Party Plaintiff against these Third Party Defendants who settled with Louis Lowin (in his former capacity as Chapter 11 Trustee for the bankrupt estates).

CONCLUSION

Based upon the preceding Findings of Fact and Conclusions of Law, a separate Final Judgment has been entered against the defendants.

## APPENDIX 1 TO FINAL JUDGMENT

| | |
|---|---:|
| 17th Street Associates | 701,108 |
| 770 South Post Oak Ventures | 1,513,180 |
| 931 Investors | 1,827,347 |
| Addison Associates | 7,125,917 |
| Aircraft Investment Services | 701,108 |
| Nathan Appleman | 739,864 |
| George F. Baker, III | 1,479,730 |
| Herbert Barg | 714,409 |
| Estate of Bernard H. Barnett and Charles D. Barnett Tenants in Common | 963,381 |
| Bernard Barnett | 693,179 |
| Evan T. Barnett, Joseph Bornstein, Harold J. Goald, Charles W. Hunter, III, Arnold Orleans, Warren Siegel and Thomas A. Westrick as successors and assignees of Parklawn Investment Associates, a dissolved Maryland general partnership | 1,131,575 |
| Barney Associates | 1,307,094 |
| Steven B. Belkin | 254,469 |
| David Bernstein | 242,440 |
| Stuart A. Bernstein | 752,392 |
| Ronald G. Birch | 167,958 |
| William M. Bittner | 125,533 |
| Bristol Associates | 1,121,774 |
| Brown Suburban Investment Co. | 709,156 |
| BSW Associates | 1,434,317 |
| Mary Victoria Butler, Revocable Trust | 748,557 |
| James E. Cafritz and William N. Cafritz, as Tenants in Common | 1,829,650 |
| Capital Development Associates | 739,787 |
| CDS Joint Venture Associates | 1,241,025 |
| Catherine A. Chandler | 125,533 |
| Marion O. Charles | 253,317 |
| Robert H. Charles | 253,317 |
| Chasin, Cockayne & Sakharoff | 699,361 |
| Chasin, Hansen & Searing | 507,345 |
| Clayman & Clayman | 253,317 |
| CMP Partners | 862,543 |
| Arthur G. Cohen | 1,207,317 |
| Richard M. Cohen | 254,278 |
| Commodity Financial Associates | 865,289 |
| Beatrice Cookson | 505,398 |
| Pearson C. Cummin, III | 757,792 |
| DAK Associates | 1,397,543 |
| Alan & Joanne Dayton | 703,595 |
| Dayton Brokerage Associates | 1,216,104 |
| Dayton Monetary Associates | 11,156,155 |
| Dayton Securities Associates | 18,486,983 |
| Delta Associates | 2,718,973 |
| Michael D. Dingman | 243,221 |
| DRN Production & Exploration | 1,504,972 |
| Bonnie Englebardt | 252,697 |
| Mary S. Engelman Revocable Trust, dated Oct. 30, 1975, f/b/o Mary S. Engelman | 377,486 |

| | |
|---|---|
| Falls Village Associates | 2,172,921 |
| Leo D. Fialkoff Trust | 1,158,627 |
| Financial Incentives, Ltd. | 4,062,659 |
| Flying Point Associates | 1,883,170 |
| Four Knights Music Co. | 693,060 |
| William J. Friedman | 1,809,810 |
| G & S Partnership | 693,060 |
| Gammon Associates | 357,907 |
| Harry Gelt, Trustee | 711,782 |
| G. Donald Gerlach | 369,932 |
| Bernard S. Gewirz | 732,992 |
| Arthur Gilbert | 693,060 |
| Josephine Gleis | 693,060 |
| Nathan Golden | 217,866 |
| Bram Goldsmith | 924,080 |
| Susan Green | 255,891 |
| GZK, Inc. | 506,633 |
| H & L Associates | 733,101 |
| HFM Investments | 1,249,818 |
| Jeffrey M. Hoffeld | 711,782 |
| Hal R. Horton | 125,533 |
| HPR Partners | 1,443,834 |
| Sherrill Hudson | 214,795 |
| Hurwitz & Co. | 702,684 |
| George H. Hurwitz | 758,095 |
| Investment Building Venture | 1,435,785 |
| Inwood Corporation | 759,951 |
| Jeltz Partnership | 951,660 |
| JMJ Enterprises, Inc. | 713,095 |
| Kabel Associates | 1,132,462 |
| George S. Kaufman | 488,806 |
| KBB Investments | 1,355,625 |
| KDA Associates | 1,099,814 |
| Kele Assets | 888,070 |
| Allyn E. Kilsheimer | 467,406 |
| Donald L. King | 889,427 |
| Kirschner Brothers | 1,109,796 |
| Richard A. Kirstein | 2,568,952 |
| James Kline and Norma Kline, Tenants in Common | 896,530 |
| KMK Partnership | 733,210 |
| Burton I. Koffman and Richard Koffman, Tenants in Common | 748,824 |
| Bernard J. (Harvey) Korman | 724,510 |
| Lester Korn | 354,579 |
| Raymond F. Kravis | 759,951 |
| Michael Landon | 1,418,315 |
| Leonard C. Lane | 1,462,476 |
| Norman Lear | 2,079,180 |
| Lerk Associates | 14,334,821 |
| Theodore N. Lerner | 3,237,986 |
| Abner Levine | 2,058,219 |
| Likas Company | 739,864 |
| Lipnick Family Limited Partnership | 733,101 |
| Litchfield Associates | 1,672,581 |
| Luxmanor Venture | 851,763 |
| Maier, Bojarsky & Zaman | 947,183 |
| Ronald J. Manganiello | 1,463,220 |
| The Marvin Group | 553,032 |
| John M. McMahon | 1,437,986 |
| Meadowmere Partners | 1,155,687 |

| | |
|---|---:|
| Meleva Associates | 752,562 |
| Louise Melhado | 1,479,187 |
| David B. Melville | 766,466 |
| Charles H. Meyers | 695,685 |
| Midas Limited Partnership | 2,642,986 |
| Dan Miller | 235,015 |
| John F. Miller, III | 2,135,426 |
| Monetary Associates | 1,690,246 |
| Herbert Nadel | 945,541 |
| Sam Nassi | 254,468 |
| Irene Nevil Trust | 240,535 |
| Ernest E. Norris | 505,398 |
| Dena M. Nowotny | 193,171 |
| Omnibus Associates | 2,305,653 |
| Arnold Orleans | 758,713 |
| J. Matthew & Lois Osborne | 253,262 |
| Nicholas G. Paleologos | 1,437,986 |
| Pete Pappas & George Pappas as successors and assignees of Pete Pappas & Sons, Inc., a liquidated corp. | 253,317 |
| PM Associates | 2,118,031 |
| Sidney Poiter | 693,060 |
| Howard Polinger | 766,650 |
| R & B Associates | 1,437,986 |
| B.M. Rankin, Jr. | 758,713 |
| Frederick D. Remsen | 758,095 |
| Robert J. Reynolds, Jr., Revocable Trust, dated Aug. 19, 1977, f/b/o, Robert J. Reynolds | 2,276,124 |
| James W. Riddell | 733,029 |
| River Cities Associates | 758,713 |
| Chester A. Rose | 1,325,336 |
| Harvey Rosenbluth | 739,683 |
| Sarane H. Ross | 461,976 |
| Rugby Associates | 703,998 |
| Derald Ruttenberg | 1,181,929 |
| Richard & Selma Rynd | 254,979 |
| Wilbur M. Schlosser | 706,359 |
| Jack Scwartzman | 695,686 |
| Hercules Segalas | 202,159 |
| Senn, Solomon & Montgomery | 921,679 |
| John Serpico | 733,210 |
| SGEWS Associates | 496,680 |
| Allan B. Solomon | 253,262 |
| Lois Steinberg | 255,488 |
| Lois Steinberg, Susan Green, Bonnie Englebart, Carol Steinberg Weisman, as Tenants in Common | 1,010,794 |
| Oscar Stempler | 233,703 |
| Tab Construction, Inc. | 693,060 |
| Textilease Corp. | 701,108 |
| Thaddeus N. Taube | 2,415,600 |
| Towne Investment Company | 693,060 |
| Universal Landsnake River Ranch | 759,951 |
| Varbros Corporation | 748,824 |
| George F. Warner | 733,210 |
| Washington Associates Partnership | 1,016,458 |
| Watermill Associates | 1,229,402 |
| Carol Weisman | 255,295 |
| Jack A. Winter | 595,712 |
| Woods Venture | 2,248,280 |

| | |
|---|---|
| Lester Wunderman | 986,486 |
| Louis A. Zuckerman | 350,554 |
| Stanley R. Zupnick | 1,434,136 |